KATOBIMAR REALTY COMPANY AND WILLIAM J. THOMP-SON, PLAINTIFFS-APPELLANTS, v. ROBERT A. WEB-STER, BUILDING INSPECTOR OF THE BOROUGH OF NEW PROVIDENCE, AND THE MAYOR AND COUNCIL OF THE BOROUGH OF NEW PROVIDENCE, DEFEND-ANTS-RESPONDENTS.

Argued September 27, 1955—Decided December 12, 1955.

115

*Mr. Frederick C. Vonhof* argued the cause for appellants.

*Mr. Fred A. Lorentz* argued the cause for respondents.

The opinion of the court was delivered by

HEHER, J.   At issue here is the legal sufficiency of an amendment to the zoning ordinance of the Borough of New Providence providing that "No lands or structures shall be used, nor shall any structures be erected, altered or used within the Industrial Zone" delineated by the ordinance "for any residential, or retail commercial purpose," and "Only industrial uses which are not detrimental to health, safety or property shall be permitted, and in no event" shall

leave be given to conduct storage yards for oil, coal, lumber, junk, certain "noxious and deleterious manufacturing," or "Any other use or purpose which in the opinion of the Mayor and Borough Council is detrimental to health, safety, or property, or to property values."

The proceeding is in lieu of *mandamus* to compel the issuance of a building permit for the construction in the industrial zone of nine retail commercial stores, to constitute a "shopping center." Plaintiffs' plot comprises 5.14 acres fronting 425 feet on Central Avenue and extending back a depth of 537 feet, the whole being within the industrial zone. The individual plaintiff, Thompson, acquired the land by deed dated June 25, 1953, recorded the ensuing September 14. He is the principal stockholder of the plaintiff corporation, which seems to be a family enterprise. The formal application for the building permit was made October 19, 1954. The building inspector deferred action pending submission of the plans and specifications for the project to the mayor and council. But negotiations began the prior April for the construction on the land of a "small shopping center consisting of nine to eleven stores in one continuous front." Then came the introduction, September 27, 1954, of the later-adopted supplement to the zoning ordinance now under attack. On October 25 the application for a building permit was renewed before the council and was "tabled until after hearing on the ordinance revising rules and regulations of the Industrial Zone is held on November 8, 1954." Upon the adoption of the supplement, the building inspector advised plaintiffs by letter dated November 15 that the proposed use "is forbidden by the Zoning Ordinance, as amended." Thereupon the complaint in this proceeding, filed the prior November 3, was amended to allege that the supplement to the ordinance is unreasonable, arbitrary and capricious and deprives plaintiffs of their property without due process of law, and, moreover, it was "enacted contrary to the statute and is null and void."

There was summary judgment for defendants on a stipulation of facts and affidavits; and the case is here by cer-

tification on our own motion of plaintiffs' pending appeal to the Appellate Division of the Superior Court.

The plaintiff Thompson acquired the lands in the Fall of 1953; and the following April, as just said, he submitted to the local planning board and the governing body plans and specifications for the project, for such action as was required under local ordinances. The parties are in controversy as to whether the proposed use was permissible under the zoning ordinance as it then was. But certain it is that the amendment of the ordinance was undertaken to bar the use proposed by plaintiffs; the denial of the building permit was based upon the "Zoning Ordinance, as amended," forbidding the "erection of a building for retail stores, which is a retail commercial use." The ban comes by the 1954 amendment; the use was not forbidden by the prior law; and the crucial inquiry concerns the legal sufficiency of the 1954 amendment.

The original ordinance of 1933 divided the borough into five zones or districts, for these use limitations: "A," one-family dwellings; "B," the use permissible in "A" and two-family dwellings "or housekeeping units"; "C," the use allowable in "A" plus "Laboratories devoted to research, design and/or experimentation, and fabrication incidental thereto"; and "D," the uses permitted in "A," "B," or "C" zones "and without limitation as to public, gainful or profitable purpose," and "Any lawful, residential, social, professional, educational, recreational, amusement, athletic, charitable, religious, commercial or business use except slaughtering of animals," and "Manufacturing, processing, producing or fabricating operations which ordinarily are not productive of injurious or offense (sic) noise, fumes, * * *."

An amended ordinance effective May 28, 1951 incorporated "portions of the 'B–1' zone and 'D' zone," therein described by metes and bounds, into an "industrial zone," and authorized any and all uses therein save (1) "Residential purposes," (2) "Storage yards for oil, coal, lumber, junk," certain "noxious and deleterious manufacturing," and "Any other use or purpose which is noxious or injurious to health,

safety or property." And then came the amendment of 1954, permitting in the "Industrial Zone" "Only industrial uses which are not detrimental to health, safety or property," and specifically excluding residential, retail commercial, and the other uses to which reference has been made. Thus, the new zone is restricted to what has come to be known as "light industrial" uses.

Plaintiffs' lands are situate in the southwesterly quarter of the borough, near the Murray Hill station of the Delaware, Lackawanna & Western Railroad's line running from Gladstone, Bernardsville and Summit to New York City, in an area having several wholesale commercial greenhouses and connected boiler plants. The plot abuts on the south the zone in which business is a permissible use. Central Avenue is one of the borough's main thoroughfares, running generally east to west; the particular plot is just west of South Street, also a main highway. In the immediate vicinity are located the Bell Laboratories, the Air Reduction Laboratories, and an office building of the All-State Insurance Company; and the construction of an office building for the American Mineral Spirits Company and a 172-suite garden apartment structure are in prospect. Due north is the plant and office building of a manufacturer of diamond drills and mining equipment; northwest a factory of the Garden Mower Company, a subsidiary of U. S. Hammered Piston Ring Company, is under construction; due west, contiguous to the plaintiffs' lands, are three separate greenhouses and the boiler rooms, heating plants and smokestacks of wholesale florists and flower growers, and to the southwest there is another such plant. Due south is a business area and 11 multiple-family dwellings and stores and outbuildings of the Baldwin Company, dealers in fuel, oil, coal and building materials and supplies, and retail hardware. Bordering the Baldwin property, and along the railroad, are a freight station and public and private track sidings, and to the south of the tracks are the railroad station, the federal postoffice, two coal pockets, one privately owned and the other the railroad's. Due east of plaintiffs' lands is an office building of the New

York Life Insurance Company, used also for the filing and storing of records and archives, and to the southeast are commercial greenhouses and boiler rooms.

On June 2, 1954 the clerk of the planning board advised the plaintiff Thompson, by letter, that at a meeting of the board held the day before Thompson's letter of May 12 "and prior application were discussed," and he, the clerk, "was directed to request the following from you: that plans show a street running from Central Avenue to Floral Avenue, same to be constructed at no cost to the Borough; that market be shown facing this street; an affidavit from people who will lease the stores stating they plan to lease; that there will be sufficient parking area to the rear of the stores and no parking for at least .75 feet from Central Avenue; that sewer line and other necessary utilities will be installed at no cost to the Borough." But Thompson was cautioned that "compliance with these requests in no way indicates that your plans will be approved."

Use restrictions upon real property must find their justification in some aspect of the police power, reasonably exerted for the public welfare. The police function cannot be expressed in terms of a definitive formula that will automatically resolve every case, for its quality and scope are commensurate with the public exigencies arising from ever-changing social and economic conditions. But it is basic to zoning, as with every exercise of the police power, that it be contained by the rule of reason; constitutional due process and equal protection ordain that the exertion of the authority shall not go beyond the public need; there cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities; a substantial intrusion upon the right infringes essential individual liberties immune to legislative interference. The restrictions may be so unreasonable as to be confiscatory, and the regulation then transgresses the organic law as arbitrary and oppressive. *Brandon v. Board of Com'rs of Town of Montclair*, 124 *N. J. L.* 135 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940).

The police power is the public right to reasonable regulation for the common good and welfare. The constitutional principles of due process and equal protection demand that the exercise of the power be devoid of unreason and arbitrariness, and the means selected for the fulfillment of the policy bear a real and substantial relation to that end. In a word, the authority coincides with the essential public need. And in zoning there must be a rational relation between the regulation and the service of the general welfare in an area of action within the range of the police power. Excesses in the realization of the statutory considerations are inadmissible. *Schmidt v. Board of Adjustment of City of Newark*, 9 *N. J.* 405 (1952).

It is fundamental in zoning policy that all property in like circumstances be treated alike. The use restraints must be general and uniform in the particular district. *Beirn v. Morris*, 14 *N. J.* 529 (1954). The essence of zoning is territorial division in keeping with the character of the lands and structures and their peculiar suitability for particular uses, and uniformity of use within the division. The genius of the constitutional and statutory zoning process is the regulation of land and buildings by districts according to the nature and extent of their use; and it goes without saying that arbitrary deviation from the general rule is forbidden, on constitutional principle as well as the policy of the statute. Undue discrimination in treatment and classification vitiates the regulation. *Schmidt v. Board of Adjustment, supra; Collins v. Board of Adjustment of Margate City*, 3 *N. J.* 200 (1949). The constitutional uniformity and equality requires that classification rest on real and not feigned differences, such as make for a distinction having some relevance to the purpose for which the classification is made, *i. e.*, zoning by districts "in accordance with a comprehensive plan" that takes into account the "nature and extent" of the use of land and buildings within the district, the statutory considerations to be served by zoning, the "character of the district and its peculiar suitability for particular uses," "with a view of conserving the value of property and encouraging the

most appropriate use of land throughout the municipality."
*R. S.* 40:55–30, 31, 32, as amended by *L.* 1948, *c.* 305.
Compare *Walters v. City of St. Louis,* 347 *U. S.* 231, 74
*S. Ct.* 505, 98 *L. Ed.* 660 (1954); *Camden County v.
Pennsauken Sewerage Authority,* 15 *N. J.* 456 (1954).

The more exclusive use is justified as the most
appropriate use of the land in the given district, *e. g.,* resi-
dence use, and by the same token such use is ordinarily per-
missible in districts set apart for the less exclusive uses.
Such is in common understanding the essence of use classifi-
cation, so much so as to have evoked little or no dissent, a
principle comporting with the constitutional rights of person
and of property. Generally, the higher uses are allowable in
the less limited use districts, normally so when account is
taken of the nature and design and the inherent limitations of
the zoning process. But, by the same reasoning, the general
rule has its exceptions; and the higher use may be forbidden
in the less restricted districts where such exclusion bears a
real and substantial relation to the general good and welfare
in the areas of service peculiar to zoning. The considerations
governing residence, business and industrial uses differ in
their very nature; and where the exclusion has a rational
relation to the field of police action comprehended in zoning,
there is no transgression upon constitutional right. And
where the sufficiency of the classification and the exclusions,
so measured, are fairly debatable, the local legislative judg-
ment prevails. The inquiry in the given case necessarily
depends upon the particular circumstances.

In *Corthouts v. Town of Newington,* 140 *Conn.* 284, 99
*A. 2d* 112, 38 *A. L. R. 2d* 1136 *(Sup. Ct. Err.* 1953), an
amendment to the local zoning ordinance prohibiting a resi-
dential use in a "heavy" industrial zone was held unreason-
able and confiscatory and therefore void as to the plaintiff's
lands. There, residence use was permitted in the "light"
industrial zone. There, also, the plaintiff acquired the land
before the adoption of the prohibitory amendment. As to
the ruling principle, Mr. Justice Baldwin said:

"Generally, the districts of less restricted uses admit the uses of the more restricted ones. * * * Before the amendment under consideration was adopted, there was no prohibition against the use of land in an industrial district for residential purposes. The amendment proscribes what has usually been considered as the highest use to which land can be put, namely, residential use, in an industrial district where uses regarded as among the lowest and most burdensome are permitted. This is a marked departure from what has heretofore been accepted as standard practice. It is not altogether novel, however. Some communities already have ordinances which prohibit a residential use in an industrial district," citing *Rathkopf, Law of Zoning & Planning* (2d ed.) (*Sup. & Dig.* 1951, *p.* 58) ; *Williams, Law of City Planning & Zoning, p.* 277.

But zoning regulations, it was said, constitute a valid exercise of the police power "only when they have a 'rational relation to the public health, safety, welfare, and prosperity of the community' and are 'not such an unreasonable exercise of (the police) power as to become arbitrary, destructive or confiscatory,'" citing *State v. Hillman,* 110 *Conn.* 92, 100, 105, 147 *A.* 294, 297 (*Sup. Ct. Err.* 1929), and whether a zoning ordinance "meets this test must be determined in the light of existing conditions, in order that the purpose for which the police power is invoked may be promoted," and the ordinance "must comply with the requirements of, and serve the purposes stated in, the statute."

Pointing out that there was no occasion to decide whether, "as a general proposition, a zoning ordinance which prohibits a residential use in an industrial district is valid," and declaring it is "easy to conceive a situation where the erection and occupation of dwelling houses on land in an industrial area in close proximity to manufactories using highly inflammable or explosive materials or giving off noxious odors or pernicious gases would have a direct relation to the public health, safety and welfare. and justify prohibitory legislation against the use of such land for residential purposes," Justice Baldwin held that the "combination of circumstances in the case at bar does not even simulate such a situation"; the question presented was whether "upon the facts, the amendment constituted a valid exercise of the police power with respect to the plaintiff's

property"; "To be justifiable, an ordinance placing a drastic limitation upon the use of the plaintiff's land, on the one hand, must reasonably serve the public health, safety and welfare, on the other"; the "facts disclose that the plaintiff's land is adaptable to, and in demand for, residential purposes," and the amendment "prevents such use and commits it to industrial purposes," and the land "is not needed now—nor will it be needed in the near future—for industrial developments"; the trial court "found no facts to indicate that the amendment would serve the public health, safety and welfare in any way, nor would the corrections to the finding claimed by the defendants, if made, show that it would have that effect," and the "facts found fail to demonstrate that the drastic curtailment imposed by the amendment is warranted," and so the amendment, in respect of the plaintiff's property, was unreasonable and confiscatory and therefore void.

See the annotation to this case, 38 *A. L. R.* 2*d* 1141, where the editor observes that although in particular circumstances a public need may arise for zoning to prevent residential uses in an industrial district, the "presence of homes in industrial areas is a matter of everyday experience, and the same experience teaches that zoning regulations generally operate 'down' rather than 'up.'"

An eminent authority on the subject has this to say:

"Use districts are ordinarily residential, business, and industrial. The district of less restrained use always admits the uses of the more restricted ones. Perhaps the only exceptions to this statement are in a few cities where dwellings are excluded from industrial districts." *Bassett, Zoning* 63.

The principles thus obtaining to sustain the higher residential use in a "heavy" industrial zone are *a fortiori* applicable to the proposed retail commercial use in the "light" industrial zone of the ordinance under review. It is difficult to perceive a rational distinction referable to the fulfillment of the statutory zoning considerations, all or any of them, between the contemplated shopping center and the uses permissible in the limited industrial district

now before us. Is the shopping center proposed here less acceptable than the business center allowed in a residence district in *Ward v. Scott*, 16 *N. J.* 16 (1954)? It does not matter that there the retail shopping concession was the subject of a variance. The principle invocable is much the same, certainly so where the landowner asserts an intrusion upon his basic right of property. *Brandon v. Board of Com'rs of Town of Montclair*, cited *supra*. Here, "noxious and deleterious manufacturing" and uses "detrimental to health, safety or property" are forbidden in the industrial zone as finally constituted.

Such was the concept and the manifest reason and spirit of the 1951 classification. Until the adoption of the 1954 amendment, business uses were permitted in the industrial zone. The motivation for the amendment is not the subject of a finding by the Superior Court. The answer of the defendant borough and its governing body to the complaint avers, *inter alia*, that the 1951 amendment and supplement to the zoning ordinance "was adopted after a thorough study of the needs of the Borough, by the Planning Board and by the Mayor and Council of the Borough, and became an integral part of a comprehensive plan for the orderly development of the Borough"; that the "intent of said Ordinance, among other things, was to exclude retail commercial uses from said zone, for the reason that said uses are detrimental to and inconsistent with the orderly development of the zone, for limited industrial purposes," but in August 1954 the mayor and council "discovered that, through inadvertence," the ordinance "failed to clearly express the intent of the Mayor and Council, to exclude retail commercial uses"; hence, the 1954 amendment. Yet there was no such exclusion by the 1951 amendment; quite the contrary. And, as said *in limine*, the planning board, considering plaintiffs' project, proposed the construction of a street and a sewer line and necessary utilities without cost to the borough and the giving of assurance of store tenancies and parking facilities, to which plaintiffs did not respond, and then came the 1954 amendment.

The projected business center and light industrial uses are not incompatible in nature; they are generally, so far as zoning policy goes, wholly congruous uses, and if in special circumstances a distinction may reasonably be made to serve an overriding public interest, such showing is not made here. There was no such finding below. The conclusion there was that the "exclusion of retail commercial uses from such light industrial zone has in fact a reasonable bearing upon the health, safety, morals and welfare of the community, including the exclusion of traffic hazards, the establishment of aesthetic levels and like elements." There is no reasonable basis for the classification. Retail commercial uses would not conflict with industrial uses. There must be a reasonable exercise of the grouping power; such is of the essence of comprehensive zoning.

But however this may be, a shopping center here would be the use most compatible with its surroundings, more in harmony with the setting of its environment; and the exclusion of such use would be unreasonable, arbitrary and capricious. The inclusion of plaintiffs' lands in the industrial zone, barred to business, does not bear a real and substantial relation to the public health, safety, morals, comfort, convenience, or the general welfare, in the particulars laid down in R. S. 40:55–32, and so it is violative of constitutional precept and the essential policy of the statute. *Brandon v. Board of Com'rs of Town of Montclair*, cited *supra*. It is not a reasonable regulation of the use of the individual property in the public interest as distinguished from an arbitrary interference with the basic right of private property. This relation to the public weal "should be proved in each case in its application to the lot in question." *Bassett, Zoning* 54. A zoning regulation may be voided as to a particular property included in a given zone by the arbitrary and unnatural running of boundary lines, not in keeping with a well-considered plan. 58 *Am. Jur.* 967.

This conclusion is plainly not in conflict with *Duffcon Concrete Products v. Borough of Cresskill*, 1 *N. J.* 509 (1949), involving an ordinance excluding all industry from

the municipality, or *Lionshead Lake, Inc., v. Township of Wayne*, 10 *N. J.* 165 (1952), prescribing the same minimum-size requirements for all houses in the municipality, or *Fischer v. Township of Bedminster*, 11 *N. J.* 194 (1952), forbidding the construction of residences on a plot of less than five acres, or *Pierro v. Baxendale*, 20 *N. J.* 17 (1955), barring motels from the municipality. We are here concerned with the exclusion of a retail commercial use from a light industrial zone, in an area where such use is in keeping with the environment, if not indeed with the permissible light industrial uses. This is not a question of "liberal" zoning, but of zoning comporting with the constitutional rights of private property and the equal protection of the laws.

The judgment is reversed and the cause is remanded for proceedings conforming to these conclusions.

WILLIAM J. BRENNAN, JR., J. (dissenting). New Jersey has witnessed a marked and salutary change in the judicial attitude toward municipal zoning over the past decade. Long overdue recognition of the legitimate aspirations of the community to further its proper social, economic and political progress, and of the propriety of requiring individual land-owners to defer to the greater public good, have replaced the narrow concepts held by former courts. Present-day decisions rightly give maximum play to the philosophy underlying our constitutional and statutory zoning provisions that localities may decide for themselves what zoning best serves and furthers the local public welfare, subject only to the rule of reason forbidding arbitrary and capricious action. See *Duffcon Concrete Products v. Borough of Cress-kill*, 1 *N. J.* 509 (1949); *Lionshead Lake, Inc., v. Township of Wayne*, 10 *N. J.* 165 (1952), appeal dismisssed 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L. Ed.* 708 (1953); *Fischer v. Township of Bedminster*, 11 *N. J.* 194 (1952); *Guaclides v. Borough of Englewood Cliffs*, 11 *N. J. Super.* 405 (*App. Div.* 1951); *Pierro v. Baxendale*, 20 *N. J.* 17

(1955). Mr. Justice Jacobs summed up the basic approach of those cases in his opinion in the *Pierro* case:

"It must always be remembered that the duty of selecting particular uses which are congruous in residential zones [only residential zones were involved] was vested by the Legislature in the municipal officials rather than in the courts. Once the selections were made and duly embodied in the comprehensive zoning ordinance of 1939 they became presumptively valid and they are not to be nullified except upon an affirmative showing that the action taken by the municipal officials was unreasonable, arbitrary or capricious. * * * * * * * * * * * * * * * * * * We are satisfied that at long last conscientious municipal officials have been sufficiently empowered to adopt reasonable zoning measures designed towards preserving the wholesome and attractive characteristics of their communities and the values of taxpayers' properties."

The instant decision not only departs from the policy of the cited cases in its application of the law to the facts but, of graver concern, does so in language, substantially *in haec verba,* which did not command majority support in *Pierro* and appears only in the *Pierro* dissent. Local governing bodies and their advisors must surely be troubled to know which—the *Pierro* majority opinion or the *Pierro* dissent—expresses the prevailing view in this court. And the bewilderment will be the greater because this opinion is filed but a few weeks after *Pierro* was decided.

The prohibition of retail commercial uses in the non-nuisance industrial district was not a 1954 innovation. The local officials believed that the prohibition was accomplished in a 1951 amendment, before plaintiffs acquired their lands. Plaintiffs also thought this was the case, because when they first sought approval of their project they sought a zone change. It was only when the effectiveness of the 1951 amendment to accomplish the purpose was questioned that the more explicit 1954 amendment was adopted.

The motivation for the prohibition was the desire to attract non-nuisance industries to the borough to increase tax ratables and support the expanded school needs and greater municipal services incident to the rapid residential growth of the community. The borough emerged after

World War II from a primarily rural and farm economy into a fast growing suburban community of modest homes. From its 1950 population of 3,500 it has grown to a 1955 population of 6,000. It was feared, and with good reason, that taxes to be realized on modest residential properties would be insufficient to support the mounting cost of schooling and borough government without undue hardship to the individual home owner.

Faced with that situation, the governing body intelligently and responsibly gave consideration to ways and means to increase tax revenues without impairment of the essentially residential character of the borough. They hit upon a program of attracting new non-nuisance industries, thereby augmenting ratables without incurring heavy additional expenses for municipal service.

Many of the post-war industrial developments are "industrial parks" where operations are limited to non-nuisance types carried on in attractive buildings on large acreages beautifully landscaped and compatible in appearance with fine residential areas. Every motorist of our State has seen and admired these desirable improvements which dot our landscape and vastly enhance its appearance. It was such a development that the borough fathers envisaged. The plan has been a marked success, as the photographs in evidence demonstrate.

This type of program as part of a comprehensive zoning plan for communities of the character of New Providence is customarily recommended by professional planners. There was expert evidence that not only are residences incompatible in such a zone but that general retail and commercial business should also be recognized as incompatible with a well planned district designed for non-nuisance industries. Numerous disadvantages from such an intermixture are referred to in the evidence.

The choice of the 130-acre area for the limited industrial use district was cautiously and purposefully made. The boundaries are a railroad line on the south, and brooks on the east, north and west, thus making a natural separation

point between the zone and the surrounding territory. Its proximity to the railroad affords spur lines where needed. The topography is vacant and level, free from trees, stones and the like, and it is accessible to a sewer line. It is also a considerable distance from the primary residence and business centers.

The area formed part of a larger area comprising the Business Zone created by the original 1933 zoning ordinance. For the almost two decades until 1951 no one located a business there. This was another reason which satisfied the governing body that the highest and best use of the land could be realized only by zoning the segment selected exclusively for limited industrial uses as part of the program to attract such business to the borough.

The 1951 ordinance also excluded future residential construction in the new district. There was evidence that this is now customary in many zoning ordinances. Reference was made to such regulations in New York, Berkeley Heights, West Orange, Somerville, Summit and Springfield Township.

And the pattern was not new to New Providence. The C Zone created by the 1933 ordinance was a laboratory zone limited to "laboratories devoted to research, design and for experimentation; and fabrication incident thereto." The ordinance barred retail commercial structures and any business or industrial use other than a laboratory. The zone was highly successful in attracting substantial research enterprises. The expert opinion evidence was that a paramount factor in the success of the zone was the prohibition of commercial uses, and that for like reasons the ban was essential to assure the success of the limited non-nuisance industrial zone.

Upon this set of facts I find it impossible to square the majority's holding with the sustaining in *Duffcon* of an ordinance excluding all industry, or in *Wayne Township* of an ordinance barring houses of less than 768 square feet for one-story buildings, or in *Bedminster Township* of an ordinance fixing a maximum five-acre requirement, or in

*Englewood Cliffs* of an ordinance excluding apartment houses from almost the entire borough, or, particularly, in *Pierro* of an ordinance excluding motels although the ordinance allowed boarding and rooming houses. Commercial shopping centers are not wholly banned from New Providence. Provision is made for them in the business districts contiguous to residential areas, where they rightly belong. In forbidding them in the district in question, the conclusion is inescapable that New Providence evolved a sound long-range policy designed to achieve a well balanced local economy and in nowise exceeded the zoning authority so to do acknowledged in the cited cases.

The majority, using substantially the identical language of the *Pierro* dissent, *viz.,* "The essence of zoning is territorial division in keeping with the character of the lands and structures and their peculiar suitability for particular uses and uniformity of use within the division," jumps from that base to the conclusion that as a matter of law, "Generally, the higher uses are allowable in the less limited use districts, normally so when account is taken of the nature and design of the inherent limitations of the zoning process." We may grant that zoning practice has been to allow the higher uses in districts zoned for lesser uses, but it escapes me how that practice is raised to a limitation in law upon the scope of municipal powers granted under the constitution and the zoning statutes.

The limitation is not to be found in either constitution or statute and, in the nature of things, there is no sound reason why the congruity of uses should be made dependent upon considerations of the place of particular uses, up or down, in the scale of uses. The majority admit this in conceding that higher uses may on occasions be excluded from zones limited to lesser uses, but, other than by saying so, they offer no standard by which to guide municipal officials to know when the local situation will be deemed exceptional by the majority. If well-conceived and carefully thought out zoning plans such as this, so obviously and peculiarly appropriate to further the well-being of the community of New

Providence, are to be struck down in this fashion, a grievous blow will be dealt the forward progress of zoning as an instrument for the enhancement of the overall social and economic welfare of our municipalities.

I vote to affirm.

This dissent is joined in by Mr. Justice JACOBS.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD and BURLING—4.

*For affirmance*—Justices OLIPHANT, JACOBS and BRENNAN—3.