73 N.J. Super. 120 (1962)
179 A.2d 145
JACK GRUBER (AND 6 OTHERS), PARTNERS T/A RARITAN ASSOCIATES, PLAINTIFFS-APPELLANTS, AND MESTAL ESTATES, ETC., PLAINTIFF,
v.
THE MAYOR AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF RARITAN, ET AL., DEFENDANTS-RESPONDENTS. JACK GRUBER (AND 6 OTHERS), PARTNERS T/A RARITAN ASSOCIATES, PLAINTIFFS-APPELLANTS,
v.
THE MAYOR AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF RARITAN, DEFENDANTS-RESPONDENTS.
(Docket Nos. L-2261-59, L-4759-59.)
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1961.
Decided March 14, 1962.
*121 Before Judges GAULKIN, KILKENNY and HERBERT.
Mr. William R. Blair, Jr., argued the cause for the appellants (Messrs. Parsons, Canzona, Blair & Warren, attorneys).
Mr. Lawrence A. Carton, Jr., argued the cause for the respondents (Messrs. Roberts, Pillsbury & Carton, attorneys).
*122 The opinion of the court was delivered by GAULKIN, J.A.D.
In 1956 plaintiffs' predecessors in title assembled a 131-acre tract and began a residential development with the approval and cooperation of the township officials. After plaintiffs and their predecessors in title (hereafter collectively called plaintiffs) had put in some roads and other improvements, started four houses, and expended or committed themselves to obligations which they allege totaled more than $500,000, the township, in 1959, took an area of 157 acres which contained all of plaintiffs' land from the residential zone, changed it to light industrial, and forbade residential uses therein altogether. By a proceeding in lieu of prerogative writs, plaintiffs challenged the validity of the amending ordinance and the refusal of the township to permit them to complete their residential development. The trial court entered judgment in favor of the township, and plaintiffs appeal.
Plaintiffs argue first that, assuming municipalities generally have the power to create industrial zones and to exclude residential uses therefrom, the exercise of that power in the case at bar was unreasonable and arbitrary and confiscated their property without compensation or due process because there is no market for industrial land in the rezoned area nor will there be in the reasonably foreseeable future, whereas there is great demand for residences.
Secondly, say plaintiffs, if the ordinance be deemed otherwise valid, the township is estopped from enforcing it against plaintiffs' property because of the dealings between plaintiffs and the township, and plaintiffs' expenditures on the strength thereof.
After the acreage was assembled it was divided into five sections. Subdivision plats for all five sections and a drainage plan therefor were prepared by Craig Finnegan between June and October 1956. Mr. Finnegan was the township engineer. On July 27, 1956 resolutions were adopted by the township committee approving the plats of sections 1, 2 and 3, but contingent upon execution of a developer's *123 agreement, a performance bond, construction of a sewage disposal plant and the filing of the plats. Each plat was to be filed within one year, but no time limits were fixed for the performance of the other contingencies. On the same date the township committee passed a resolution authorizing the formation by plaintiffs of the Raritan Valley Sanitation Company, which was to construct and operate the disposal plant. On August 23, 1956 a developer's agreement and a bond for performance relating to section 1 were executed.
On October 1, 1956 the township committee, pursuant to N.J.S.A. 40:55-1.4 and 1.14, adopted ordinances establishing a planning board and regulating land subdivision. Prior to that time the township had no planning board and no ordinances regulating land subdivision; the plats apparently had been approved pursuant to the Map Act, L. 1953, c. 358. On November 12 the township committee amended said land subdivision ordinance to postpone its effective date to December 12, 1956. This was done to permit approval of the plats of sections 4 and 5 by the township committee prior to the assumption by the planning board of land subdivision control, and on December 7, 1956 the township committee did approve the plats for sections 4 and 5, by resolutions similar in content to those by which sections 1, 2 and 3 had been approved.
On November 5 and 6, 1956 building permits and board of health permits were issued for the construction of four model homes in section 1. In the spring of 1957 work was commenced on these homes, curbs and sidewalks were installed in front of them and some road grading and gravelling was done.
On July 25, 1957 the township committee adopted a resolution which granted the developers until August 9, 1957 to enter into the developer's agreements respecting sections 2 and 3 and extending to the same date the time for the filing of the plats of sections 1, 2 and 3 in the Monmouth County Clerk's office. On August 7, 1957 the *124 township committee adopted a resolution further extending the time for the execution of the developer's agreements relating to sections 2 and 3 and the time for the filing of the plats of sections 1, 2 and 3 until November 1, 1957. On October 31, 1957 the developer's agreements and the bonds to secure performance thereof relating to sections 2 and 3 were executed, and approval of the plats of the three sections was endorsed thereon by the mayor and the township clerk. The plats were approved by the Monmouth County Planning Board on November 1, 1957 and were filed on that day in the Monmouth County Clerk's office. The plats carried the following certification of township engineer Finnegan:
"I have carefully examined this map and find that it conforms with all the laws of the State and municipal ordinances and requirements applicable thereto."
On November 14, 1957 the township committee adopted a resolution extending the time for filing the plats of sections 4 and 5 "for an additional two years and until December 7, 1959." It appears that the reason for the various extensions was the developers' financial problems, and work on the development did not go forward to any substantial degree from 1957 until plaintiffs took over in November 1958. The four houses were not completed, no others were started, and there was no further installation of roads, sewers or other improvements.
On July 14, 1958 the township adopted its first zoning ordinance. The zoning map which was part of the ordinance sketched the lots just as they were laid out in the plaintiffs' subdivision, in a large area zoned for residential use. In addition, the zoning ordinance made special provision to preserve the rights of existing developments.
In October 1958 plaintiffs made arrangements to take over the development. Some of them had previously been involved in the enterprise, as principals or as investors. Before agreeing to take it over plaintiffs or their representatives *125 conferred with township officials and satisfied themselves that there would be no problem in connection with the filing of the plats for sections 4 and 5 and that certificates of occupancy would be issued upon the completion of the four houses. There was no question at that time but that they would be permitted to build residences. On November 26, 1958 plaintiffs acquired title by deed to a corporation organized by them. The title was subsequently transferred to the plaintiffs individually.
Plaintiffs contend that on the strength of their belief that they would be able to complete the residential development, induced by the action of the township and the existing zoning ordinances, they made payments and assumed obligations at the time of the acquisition of title totalling $440,000. In addition, they claim they agreed to indemnify a prior party in interest for such loss as he might suffer by reason of a $100,000 bond upon which he had become obligated in connection with the filing of the plats for sections 1, 2 and 3. After acquiring title plaintiffs commenced negotiations for the construction of the sewerage treatment plant, the extension of water service, and the furtherance of the development with the Federal Housing Administration, the Board of Public Utility Commissioners and the Garden State Parkway. Plaintiffs testified that after the acquisition of title they became obligated to pay the additional sum of $68,000, bringing the total of their payments or obligations to $508,000 in addition to the indemnification of the $100,000 bond. Defendants dispute these amounts, but, for reasons which will become apparent later in this opinion, it is not necessary to determine the true total. Suffice it to say that the total is certainly in six figures.
The township planning board, on April 15, 1959, adopted a resolution recommending the rezoning of the subject area. However, no action was taken by the township committee until August 19, 1959, when it adopted a resolution approving such rezoning and authorizing the drafting of an ordinance. Plaintiffs contend that the first information *126 they had of proposed rezoning was a telephone call in August 1959 from a newspaper reporter inquiring as to plaintiffs' views regarding it. Plaintiffs protested and were afforded an opportunity to appear before the planning board to outline their objections but, on November 23, 1959, the ordinance was passed.
Such dealings between private individuals would doubtless create an estoppel. The township contends, however, that estoppel may not be asserted against a municipality except under special circumstances not present here, especially since the acts of the township which took place after October 1, 1956, when the ordinances establishing the planning board and regulating land subdivision were passed, were ultra vires. The township's contention is that after those ordinances were passed the township committee had no authority to grant extensions of time or to act in any fashion with reference to any development, for such matters were then wholly within the jurisdiction of the planning board and controlled by the land subdivision ordinance; that not having perfected their development prior to the adoption of the planning board and land subdivision ordinances, plaintiffs had acquired no rights under the pre-existing law; their status was the same as if they were the owners of virgin undeveloped land and they were required to start de novo before the planning board.
Of course, estoppel cannot give validity to an unlawful or ultra vires act, but it may prevent the municipality from doing that which it would otherwise have had the right to do. Hilton Acres v. Klein, 35 N.J. 570, 581-584 (1961); Tremarco Corporation v. Garzio, 32 N.J. 448 (1960). See also Johnson v. Hospital Service Plan of New Jersey, 25 N.J. 134 (1957); Vogt v. Belmar, 14 N.J. 195 (1954). A municipality is not totally exempt from the principles of fair dealing. As the court said in Appeal of Howard D. Johnson Co. (Howard D. Johnson Company v. Township of Wall), 36 N.J. 443, 446 (1962), "Indeed, government itself is created to provide justice; *127 its agent, a municipality, should be loath to succeed upon a mere tactical advantage." As was said in Berger, "Estoppel Against the Government," 21 U. Chi. L. Rev. 680, 707 (1954):
"The claim of the government to an immunity from estoppel is in fact a claim to exemption from the requirements of morals and justice. As such, it needs to be jealously scrutinized at every step. Confidence in the fairness of the government cements our social institutions. No pinch-penny enrichment of the government can compensate for an impairment of that confidence, for the affront to morals and justice involved is the repudiation of a governmental representation."
Maguire and Zimet, in "Hobson's Choice and Similar Practices in Federal Taxation," 48 Harv. L. Rev. 1281 (1935), state the same thought more succinctly:
"If we say with Mr. Justice Holmes, `Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens."
See also Newman, "Should Official Advice Be Reliable  Proposals as to Estoppel and Related Doctrines in Administrative Law," 53 Colum. L. Rev. 374 (1953); Clark, "Estoppel Against State, County and City," 23 Wash. L. Rev. 51 (1948); Farrer, "A Prerogative Fallacy  That the Crown Is Not Bound By Estoppel," 49 L.Q. Rev. 511 (1933); 19 Am. Jur., Estoppel, sec. 166 and sec. 198; 6 McQuillin, Municipal Corporations, sec. 20.13 and 10 Id. sec. 29.102 and sec. 29.103.
In Tremarco, supra, 32 N.J., at p. 456, the court recognized that the dealings between a landowner and a municipality can reach a point at which "it can be said that * * * [the] individual has performed acts which form the wellspring from which certain protectable interests may flow and create a countervailing force which will prevail over the normally paramount authority of the municipality to preserve the desirable characteristics of the community through zoning."
*128 In the Hilton Acres case the court held that even though the developer had relied upon ultra vires acts of the municipality the developer was entitled upon equitable principles akin to estoppel to be put back into the position it occupied at the time of the municipality's acts upon which he had relied. So here, even if it were true that there had not been created such an estoppel as may be asserted under our law against a municipality with the same effect as against an individual, the expenditures and the course of dealing between the plaintiffs and the township committee (including the latter's ultra vires acts) would nevertheless have a bearing upon whether the barring of residential use in this 157-acre area, of which plaintiff owned 131 acres or 83%, was arbitrary, unreasonable and confiscatory.
Plaintiffs had purchased the land for a large sum in 1956; they had acquired it to develop for residences before the township had a planning board, a land subdivision ordinance or a zoning ordinance, and they had persisted, albeit haltingly and with interrputions, to develop it for such purposes at large expense and with the cooperation of the township from 1956 until just before the passage of the amendment in 1959. The new owners had taken over the project in 1958 in good faith and at enormous expense. In any event, and especially after all that, it was not reasonable to bar residential development unless the land could be sold within a reasonable time for industrial use. It is interesting to note that in the industrial area created in the original zoning ordinance, passed in 1958, residence use was not forbidden and is even now permitted. The 1959 amendment forbade residential use only in the 157 acres owned almost entirely by plaintiffs. Plaintiffs offered proof at the trial that there is no present demand for industrial property in the area nor any likelihood of such demand in the foreseeable future. In his letter opinion the trial judge stated that defendants' witness John Lazarus "testified that in his opinion the tract would be valuable for industrial development," but the trial judge did not *129 state that he found that to be the fact. We find that there is nothing in the record to justify a conclusion that the property is now or will in the foreseeable future be saleable for industrial use. On the contrary, it seems clear from the record that there is no such present or future market.
"A municipality may determine to separate residential uses from industrial." Fanale v. Hasbrouck Heights, 26 N.J. 320, 328 (1958). But whether the exercise of the power in a given instance is valid is a question "of reasonableness under the circumstances." Kozesnik v. Montgomery Tp., 24 N.J. 154, 169 (1957). Accord, Katobimar Realty Co. v. Webster, 20 N.J. 114 (1955). In Corthouts v. Town of Newington, 140 Conn. 284, 99 A.2d 112 (1953), cited with approval in Katobimar, supra, the Supreme Court of Errors of Connecticut dealt with a situation like the one at bar, and held (pp. 113-114):
"The plaintiff's land is adapted to development for residential use, for which there is a demand. Such use is the highest and best to which it can be put. Unless it can be devoted to residential purposes, in all probability it will remain unused for many years. It is not adapted to industrial use, for which there is not any present demand in Newington and none is expected * * * To be justifiable, an ordinance placing a drastic limitation upon the use of the plaintiff's land, on the one hand, must reasonably serve the public health, safety and welfare, on the other. 8 McQuillin, Municipal Corporations (3d Ed.) § 25.40. The facts disclose that the plaintiff's land is adaptable to, and in demand for, residential purposes. The amendment prevents such use and commits it to industrial purposes. The land is not needed now  nor will it be needed in the near future  for industrial development.
This is not a case where an owner of land is seeking to have the commission rezone the portion of it which is located within an industrial district. The plaintiff is simply insisting that he be permitted to devote his land to residential use until such time as need of it for industrial purposes arises. Since the amendment, in effect, prevents the plaintiff from using his land for any feasible purpose, it is unreasonable and confiscatory."
See also People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove, 16 Ill.2d 183, 157 N.E.2d 33 (Sup. Ct. 1959).
*130 The total area of the township is 3584 acres. Although prior to July 1958 the township had no zoning ordinance whatever, in 1957 only 17.7 acres were devoted to industrial use, little if any of which was in the rezoned area now under consideration. Even though there was no zoning ordinance before 1958 and the 1958 zoning ordinance created an industrial area, from 1957 to 1959 industrial use increased only five acres (none of it in the area in question), whereas residential use in the township leaped from 458 acres to 762 acres in the same two-year period. The area here in question borders on the communities of Holmdel and Matawan. Although those communities sought industry, only a very small part of their large areas of vacant land, much of it contiguous to the premises in question, was so occupied. Plaintiffs' expert testified that the highest and best use of the area was residential and that it could not be reasonably and practicably sold for industrial use. The mayor of the township, a lifelong resident of the township and executive vice-president of the Keansburg Savings and Loan Association, testified that no new industry had entered the township since before the date of the adoption of its original zoning ordinance in July 1958  not even in the area originally zoned for that purpose. There was similar testimony from other witnesses. Defendant's expert Lazarus did testify that in his opinion there was a demand for land for industry, but the only basis he offered for that opinion was that one or two companies had thought of Raritan as a possible site for a factory. However, they settled elsewhere. He had sold no property in the township for industrial purposes and did not know of anyone who had. Opinion evidence based on so nebulous a foundation is worthless.
In short, the evidence compels the conclusion that it is most unlikely that the plaintiffs' lands will be saleable for industry within any period during which it would be constitutionally permissible to tell plaintiffs to wait, and in the meantime to pay taxes on the land, interest and other *131 carrying charges on the mortgages and other financing, arrange for the payment of borrowings as they fell due, and forego any yield on their investment. When we add to this the course of dealing between the parties, the plaintiffs' investment and the other facts outlined above, it seems to us beyond question that the amendment is unreasonable, arbitrary and confiscatory.
In his opinion, the trial judge said (emphasis ours):
"In the spring of 1959 the Planning Board, after conferring with Community Planning Associates, a professional planning consultant firm retained by the township, determined that there was a need for an additional industrial zone, due to the extraordinary increase in population, the severe financial crisis facing the township, and the school problem.
The decision of the Planning Board was prompted by a desire to create a better economic balance in the township. It was felt that industrial development would create higher tax revenue than residential development in any given area, reducing the heavy tax burden placed on the home owner, and additionally, industry would require less in the way of municipal services, particularly school facilities."
This is doubtless true; we sympathize with the needs and problems of this community, and are certain that the township chose this course in good faith in order to prevent the additional burden that would be cast upon the municipality by more houses. But the community's pressing problems do not make legal the confiscation of plaintiffs' property. We no longer guard the landowner's rights as we did in the early days of zoning but it is still the law, as the Supreme Court said in Katobimar, supra, 20 N.J., at p. 122:
"But it is basic to zoning, as with every exercise of the police power, that it be contained by the rule of reason; constitutional due process and equal protection ordain that the exertion of the authority shall not go beyond the public need; there cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities; a substantial intrusion upon the right infringes essential individual liberties immune to legislative interference. The restrictions may be so unreasonable as to be confiscatory, and the regulation then transgresses the organic law as arbitrary and oppressive."
*132 Since there are only 26 acres of land in the area other than plaintiffs' it seems to us neither just nor desirable that the invalidation of the amendatory ordinance be limited to plaintiffs' property. It is therefore set aside in toto as to all 157 acres.
The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.