876 A.2d 877

WILLIAMS SCOTSMAN, INC., PLAINTIFF–APPELLANT, v. THE GARFIELD BOARD OF EDUCATION, DEFENDANT–RESPON-DENT/THIRD–PARTY PLAINTIFF, v. STATE OF NEW JERSEY DEPARTMENT OF EDUCATION AND NEW JERSEY ECONOM-IC DEVELOPMENT AGENCY, THIRD–PARTY DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 27, 2005—Decided July 15, 2005.

52

Before Judges WEFING, PAYNE and C.S. FISHER.

*Charles F. Kenny* argued the cause for appellant (*Peckar & Abramson,* attorneys; *Mr. Kenny and Craig H. Parker,* on the brief).

*Howard M. Nirenberg* argued the cause for respondent Garfield Board of Education (*Nirenberg & Varano,* attorneys; *Mr. Nirenberg* and *Sandra N. Varano,* on the brief).

Respondents State of New Jersey Department of Education and New Jersey Economic Development Agency submitted a statement in lieu of brief.

The opinion of the court was delivered by

WEFING, P.J.A.D.

Plaintiff Williams Scotsman, Inc. appeals from a trial court order granting summary judgment to defendant Garfield Board of Education. After reviewing the record in light of the contentions advanced on appeal, we reverse.

This litigation is an outgrowth of the continuing efforts of the Supreme Court to assure equal educational opportunities for the children of this state, no matter in which district they reside. Garfield is one of the original twenty-eight districts identified in *Abbott v. Burke,* 119 *N.J.* 287, 575 *A.2d* 359 (1990) (*Abbott II*) as evidencing special needs, generally referred to as "Abbott" districts. In late 2000 Garfield learned that by September 2001 the

Abbott districts were required to have in place all-day pre-school programs for the three- to four-year-old children in their districts. Garfield, however, did not have the physical accommodations available in which it could conduct such a program. Plaintiff Scotsman is in the business of fabricating and supplying temporary buildings. To comply with the directive that it provide such an all-day pre-school program, the Garfield Board of Education passed resolution 12–294–00 on December 19, 2000, authorizing Edward F. Izbicki, Sr., the Board's business administrator and secretary, "to arrange with William Scottsman [sic] for the lease of at least 10 trailers for Preschool 3 and 4 year olds." Pursuant to that authority, Izbicki executed a purchase order with Scotsman on March 23, 2001, which stated, in its entirety, "As per Drawing Dated 2–16–01 Job # UIS00895 Price Not [t]o exceed $13,950 60 Months." The superintendent of schools initialed the purchase order to indicate his approval. Scotsman filed suit when Garfield refused to accept delivery after Scotsman completed its work.

The directive relating to all-day pre-school programs affected all of the Abbott districts, and in February 2001 representatives of the New Jersey Department of Education (DOE) met with representatives from those districts, including Garfield, to discuss plans to meet this deadline. The DOE was planning to obtain temporary modular facilities for all of the Abbott districts, but Garfield told the department officials that it was dealing directly with Scotsman to obtain its own temporary facilities. Garfield explained to the DOE that it was anticipating receiving funds from the Economic Development Agency (EDA), and it was planning to use these moneys to pay Scotsman.[1] The DOE representatives expressed no objections or misgivings about Garfield's plan. In addition, Izbicki testified that when he saw the plans proposed by the DOE for the modular units it would be supplying to the Abbott districts, he considered them "tin cans" and unacceptable from an educational perspective.

---

[1] Garfield asserts in this litigation that it had earlier advised the EDA of its plans in this regard, but that assertion is disputed.

Scotsman has done business with a number of school districts in New Jersey for a number of years. It was aware that Garfield's status as an Abbott district qualified it to receive additional funds from the State. Garfield advised Scotsman that it was planning to use EDA money to pay for these trailers. Scotsman's area manager, Eric Anderson, testified that he asked Izbicki on several occasions whether Garfield could proceed in this manner, as opposed to soliciting public bids. Izbicki continually assured him that, based on the Board's December 2000 resolution, there was no need to solicit bids. Izbicki also assured Anderson that Garfield was not dependent upon the State to pay for these units, because it had other funds available.

One reason for Scotsman's inquiry in this regard, apart from its general knowledge obtained through years of doing business in New Jersey, was the fact that at the same time that it was contracting with Garfield, Scotsman was submitting a bid to the DOE to supply temporary facilities for the remaining Abbott districts to meet the September 2001 deadline for full-day pre-school programs.

Scotsman proceeded to build the facility designed by Garfield. It is twenty thousand square feet and designed to accommodate 150 pupils. When it was completed, however, the State refused to permit Garfield to use State funds to pay Scotsman because Garfield had contracted with Scotsman directly, without soliciting bids in accordance with the requirements of the Public School Contracts Law, *N.J.S.A.* 18A:18A–1 to –59. Garfield then refused to accept delivery of the completed modular facility that Scotsman had built in compliance with Garfield's design. Garfield took the position that its contract with Scotsman was void in light of the failure to meet the requirements of the public bidding statute.

Eventually, the DOE delivered to Garfield temporary units for its pre-school program that it had arranged to purchase through a public bid. According to the record before us, the State was able to deliver these units to Garfield because another Abbott district had deemed them so inferior, it had refused to accept them.

According to the trial court's letter opinion in this matter, the units supplied by the State were "less aesthetically pleasing, less educationally sound, and more expensive" than the unit Garfield had contracted to obtain from Scotsman.

After discovery was completed, the matter was presented to the trial court on cross-motions for summary judgment. Scotsman contended that Garfield should be estopped from relying on the public schools bidding statute. The trial court, however, declined to apply estoppel to Garfield, finding that Scotsman should have been aware of the requirements of the bidding statute. It considered the contract void ab initio and unenforceable.

Having reviewed this record, we are satisfied that the trial court erred when it precluded Scotsman as a matter of law from invoking the doctrine of equitable estoppel against Garfield.

**I**

The Public School Contracts Law establishes specific requirements with which public schools must abide when contracting for services and goods. *N.J.S.A.* 18A:18A–1 to –10. Specifically, *N.J.S.A.* 18A:18A–4(a) provides:

> Every contract for the provision or performance of any goods or services, the cost of which in the aggregate exceeds the bid threshold, shall be awarded only by resolution of the board of education to the lowest responsible bidder after public advertising for bids and bidding therefor, except as is provided otherwise in this chapter or specifically by any other law.
>
> [*N.J.S.A.* 18A:18A–4(a).]

The purpose of the Public School Contracts Law is to "[protect] the public interest by keeping costs at a minimum and [prevent] fraud." *Bd. of Educ. of City of Asbury Park v. Hoek*, 38 *N.J.* 213, 231, 183 *A.*2d 633 (1962); *see* Michael S. Simon and Dakota W. Byfield, *Bidding on Public Construction Contracts, New Jersey Lawyer Magazine*, Oct. 2002, at 33 (noting, "[l]itigants are constantly reminded that the public contracting laws were enacted for the public good and are to be construed toward that end ... [t]he purpose is to guard against not only corruption and favoritism but also improvidence").

There is, however, an emergency exception to the Public School Contracts Law that permits a district to enter into a contract absent a public bid. Specifically, *N.J.S.A.* 18A:18A–7 provides:

[a]ny contract may be negotiated or awarded for a board of education without public advertising for bids and bidding therefor, notwithstanding that the contract price will exceed the bid threshold when an emergency affecting the health or safety of occupants of school property requires the immediate delivery of goods or the performance of services, provided that the contracts are awarded in the following manner:

a. The official in charge of the building, facility or equipment wherein the emergency occurred or such other officer or employee as may be authorized to act in place of that official, shall notify the purchasing agent or a supervisor of the purchasing agent of the need for the performance of a contract, the nature of the emergency, the time of its occurrence and the need for invoking this section. If that person is satisfied that an emergency exists, that person shall be authorized to award a contract or contracts for such purposes as may be necessary to respond to the emergent needs. Such notification shall be reduced to writing and filed with the purchasing agent as soon as practicable.

[*N.J.S.A.* 18A:18A–7.]

Moreover, the statute provides that "[u]pon the furnishing of such goods or services ... the contractor furnishing such goods or services, shall be entitled to be paid therefor and the board of education shall be obligated for said payment." *N.J.S.A.* 18A:18A–7(b).

## II

■ In *Summer Cottagers' Ass'n of Cape May v. City of Cape May,* 19 *N.J.* 493, 503–04, 117 *A.2d* 585 (1955), the New Jersey Supreme Court defined the doctrine of equitable estoppel. The Court explained,

[t]he essential principle of the policy of estoppel here invoked is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct. An estoppel by matter in pais may arise by silence or omission where one is under a duty to speak or act. It has to do with the inducement of conduct to action or nonaction. One's act or acceptance may close his mouth to allege or prove the truth. The doing or forbearing to do an act induced by the conduct of another may work an estoppel to avoid wrong or injury ensuing from reasonable reliance upon such conduct. The repudiation of one's act done or position assumed is not permissible where that course would work injustice to another who, having the right to do so, has relied thereon.

[19 *N.J.* at 503–04, 117 *A.*2d 585 (1955) (citations omitted).]

Although the doctrine of equitable estoppel is " 'rarely invoked against a governmental entity,' " *Wood v. Borough of Wildwood Crest*, 319 *N.J.Super.* 650, 656, 726 *A.*2d 310 (App.Div.1999) (quoting *County of Morris v. Fauver*, 153 *N.J.* 80, 104, 707 *A.*2d 958 (1998)), the doctrine "may be invoked against a municipality 'where the interests of justice, morality and common fairness clearly dictate that course.' " *Middletown Township Policemen's Benevolent Ass'n Local No. 124 v. Township of Middletown*, 162 *N.J.* 361, 367, 744 *A.*2d 649 (2000) (quoting *Gruber v. Mayor and Twp. Comm. of Twp. of Raritan*, 39 *N.J.* 1, 13, 186 *A.*2d 489 (1962)).

Moreover, the New Jersey Supreme Court has held that courts should examine equitable considerations when assessing governmental conduct and that the "reliance factor," in particular, should be taken into account by the court. *Skulski v. Nolan*, 68 *N.J.* 179, 198–99, 343 *A.*2d 721 (1975); *see also Hill v. Bd. of Adjustment of Borough of Eatontown*, 122 *N.J.Super.* 156, 162, 299 *A.*2d 737 (App.Div.1972) (finding that "if a permit was 'irregularly' issued, but in good faith and within the ambit of the building inspector's duty, it is not 'utterly void' and estoppel is permissible with proper good faith reliance thereon"). The Court did recognize, however, that an examination of the governmental action at issue must occur prior to evaluating the equitable considerations. *Middletown Township Policemen's Benevolent Ass'n Local No. 124*, *supra*, 162 *N.J.* at 368, 744 *A.*2d 649 (citing *Skulski*, *supra*, 68 *N.J.* at 198–99, 343 *A.*2d 721).

In *Summer Cottagers' Ass'n of Cape May*, *supra*, the Court distinguished between two types of actions that should be considered when determining whether to invoke equitable estoppel against a municipality. The Court held:

There is a distinction between an act utterly beyond the jurisdiction of a municipal corporation and the irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional. The former are ultra vires in the primary sense and void; the latter, ultra vires only in a secondary sense which

does not preclude ratification or the application of the doctrine of estoppel in the interest of equity and essential justice.

[19 *N.J.* at 504, 117 *A.*2d 585; *see also Gruber, supra*, 39 *N.J.* at 14–15, 186 *A.*2d 489.]

In *Summer Cottagers'*, the plaintiff-appellants were seeking a judgment to declare a conveyance of property by a local governing body null and void for noncompliance with a statute. 19 *N.J.* at 497–98, 117 *A.*2d 585. The Court found that the sale was within the municipality's power, even though the municipality did not serve proper public notice as required by statute. *Id.* at 506, 117 *A.*2d 585.

Subsequent courts have utilized this analytical framework in a variety of contexts and have held that "a municipality may be estopped if there is reasonable reliance on a good faith act of an administrative official, within the ambit of his official duty . . . ." *Wood, supra*, 319 *N.J.Super.* at 658, 726 *A.*2d 310 (citing *Scardigli v. Borough of Haddonfield Zoning Board of Adjustment*, 300 *N.J.Super.* 314, 319–20, 692 *A.*2d 1012 (App.Div.1997)).

We consider Garfield's assertion that estoppel cannot be invoked because its contract with Scotsman was void to be incomplete because it overlooks the distinction long recognized by the Supreme Court between the doing of an act "utterly beyond" the power of the municipal entity and "the irregular exercise of a basic power." *Summer Cottagers', supra*, 19 *N.J.* at 504, 117 *A.*2d 585. It is only the former which is completely void; the latter is subject, in appropriate, limited instances, to estoppel. *Ibid.*

Just as in *Summer Cottagers'*, in which the Supreme Court held that Cape May's sale of certain lands was not "utterly beyond" its powers but represented an "irregular exercise" of its powers because of the failure to comply with all of the public notice requirements, Garfield's contract with Scotsman was not "utterly beyond" its power. In our judgment, by not complying with the mandates of the bidding statute, Garfield engaged in an "irregular exercise" of its powers and, accordingly, may, in appropriate circumstances, be subject to estoppel.

Garfield points to the Supreme Court's decision in *Saint Barnabas Medical Center v. Essex County*, 111 *N.J.* 67, 543 *A.*2d 34 (1988), as further support for its position that it cannot be held liable to Scotsman. We do not consider that case to buttress Garfield's position here.

In that case, three days after Jessie Williams began serving a fifteen-day sentence at the Essex County Jail, he set himself on fire. *Id.* at 70, 543 *A.*2d 34. Corrections officers at the jail took Williams to Saint Barnabas Hospital, which has a burn unit, rather than to University Hospital, with which the county had a contract to provide medical care for prisoners. *Id.* at 70–71, 543 *A.*2d 34. Three days later, hospital personnel called the jail to verify that the county would be responsible for the costs of Williams's care. *Id.* at 71, 543 *A.*2d 34. Jail personnel responded that arrangements had been made to vacate Williams's sentence as of that day and that the county would pay for his care through the end of the day, but not beyond. *Ibid.* It confirmed that position by letter. *Ibid.* Williams remained in the hospital for approximately seven weeks, and the hospital billed the county for the costs of his care—$53,725.59. *Ibid.* When the county refused to pay, the hospital sued. *Ibid.* The trial court and this court found an implied agreement by the county to pay. *Id.* at 72, 543 *A.*2d 34. The trial court concluded this implied agreement covered the entire term of the hospitalization, while this court concluded it ran no longer than the point at which the hospital could have lawfully discharged Williams. *Id.* at 72–73, 543 *A.*2d 34.

The Supreme Court, however, disagreed. After setting forth the respective responsibilities of the county and the hospital to provide medical care for inmates and the indigent, the Court found that "a contract was neither formed nor contemplated" by the parties. *Id.* at 77, 543 *A.*2d 34. In the course of its opinion, the Court wrote:

Even if the actions of plaintiff's agents are assumed to have manifested an objectively reasonable intent and expectation of receiving ordinary, complete compensation, Saint Barnabas could not, under the circumstances of this case, have reasonably inferred from the conduct of the County's agents an intent to pay for

the services "requested." Defendant Essex County is subject to the strictures of the Local Public Contracts Law ... which seeks to protect public funds by ensuring that money is spent in an efficient manner by those properly authorized to spend it. . . . Accordingly, the law presumes that public contractors operate with knowledge of relevant laws constraining the procedural and substantive discretion and authority of officials with whom they deal. . . .

[*Id.* at 77, 543 *A.*2d 34.]

The circumstances of this case, however, are markedly different from those with which the Court was dealing. In *Saint Barnabas,* jail personnel clearly told the hospital three days after Williams had been admitted that in their view, the County had no responsibility to pay for Williams's care past that day. Faced with that clear assertion, the Court's conclusion that there was no contract is hardly exceptionable. Because the hospital continued to provide care even after being informed of the county's position, the circumstances of that case did not call for the Court to consider estoppel.

Here, on the other hand, according to the record presented in connection with the summary judgment motions, not only did Garfield assure Scotsman that the transaction did not require bidding, it also assured Scotsman that it had funds to pay for this unit apart from any contribution by the State.

Garfield argues that Scotsman should have checked with its own attorneys to see if this transaction was subject to the bidding statute. We would consider it somewhat anomalous to impose such a duty upon Scotsman and conclude that its failure in this regard deprives it of any recovery, while permitting Garfield to escape any liability after allegedly assuring Scotsman that no such duty existed.

We acknowledge the need for compliance with bidding statutes, which are designed to protect the public interest. *Bd. of Educ. Of City of Asbury Park v. Hoek, supra.*

A major objective of all public bidding statutes has been to promote the honesty and integrity of those bidding and of the system itself.

Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to

secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.

[*Keyes Martin & Co. v. Director, Div. of Purchase,* 99 *N.J.* 244, 256, 491 *A.*2d 1236 (1985) (quoting *Terminal Const. Corp. v. Atlantic County Sewerage Auth.,* 67 *N.J.* 403, 409–10, 341 *A.*2d 327 (1975)).]

We are satisfied, nonetheless, that it does not contravene the purposes underlying our public bidding statutes to permit Scotsman to invoke estoppel against Garfield. It appears uncontroverted from the record before us that if Garfield had accepted delivery, it would have a superior product at a lesser cost than the DOE received by bid. Further, no matter how much one may scour this record, it contains not the slightest hint of any impropriety in Garfield's decision to deal directly with Scotsman.

█ We have acknowledged earlier in this opinion that estoppel "is rarely invoked against a governmental entity." *Wood v. Borough of Wildwood Crest, supra,* 319 *N.J.Super.* at 656, 726 *A.*2d 310 (quoting *County of Morris v. Fauver, supra,* 153 *N.J.* at 104, 707 *A.*2d 958). A municipality, however, "is not totally exempt from the principles of fair dealing" *Gruber v. Mayor and Tp. Com. Of Raritan Tp.,* 73 *N.J.Super.* 120, 126, 179 *A.*2d 145 (App.Div.), *aff'd,* 39 *N.J.* 1, 186 *A.*2d 489 (1962), and when dealing with the public, it must "turn square corners." *W.V. Pangborne & Co. v. N.J. DOT,* 116 *N.J.* 543, 561, 562 *A.*2d 222 (1989).

█ We are satisfied that in the present circumstance Scotsman is entitled to assert that Garfield is estopped from repudiating its dealings with Scotsman. We do not deem the record sufficient, however, for us to rule as a matter of law that Scotsman is entitled to prevail on the merits of its claim, there being, in our view, sufficient questions of fact as to require a plenary hearing.

We do not address the question whether Scotsman is entitled to recovery under a theory of quantum meruit because the trial court

made no ruling on that issue. We decline to address it in the first instance.

The order under review is reversed, and the matter is remanded to the trial court for further proceedings in accordance with this opinion.