CIBA–GEIGY CORPORATION, PLAINTIFF, v. TOWNSHIP OF DOVER AND MAYOR AND TOWNSHIP COMMITTEE OF TOWNSHIP OF DOVER, DEFENDANTS.

and

SAMUEL REICH, BERTA REICH AND ROSA SINGER, PLAINTIFFS, v. TOWNSHIP OF DOVER AND MAYOR AND TOWNSHIP COMMITTEE OF TOWNSHIP OF DOVER, DEFENDANTS.

Superior Court of New Jersey
Law Division Ocean County

Decided December 6, 1988.

*William J. Wolf (Bathgate, Wegener, Wouters & Neumann,* attorneys) and *Frederick A.O. Schwarz, Jr. pro hac vice (Cravath, Swaine & Moore,* attorneys) for plaintiff Ciba–Geigy Corporation.

*Jonas Singer* for plaintiffs Samuel Reich, Berta Reich and Rosa Singer *(Wells & Singer,* attorneys).

*Edmund J. Corrigan* and *Francis Piscal* for defendants Township of Dover and Mayor and Township Committee of Township of Dover.

*Edward F. Liston, Jr.* for *amicus curiae* Ocean County Citizens for Clean Water (Carluccio & Liston, attorneys).

SERPENTELLI, A.J.S.C.

Plaintiffs instituted actions in lieu of prerogative writs challenging an ordinance adopted by defendant rezoning plaintiffs' properties from Industrial, Rural Highway and Rural Residential designations to a Preservation–Reclamation zone. The court finds the ordinance is not a valid exercise of the zoning power.

The Ciba–Geigy (hereinafter Ciba) property consists of approximately 1,275 acres upon which it and its predecessor have operated a chemical plant since the early 1950s. Apparently, the zoning has permitted that use since its inception. Each master plan adopted in the township to date has classified Ciba's property as Industrial. The other property rezoned by the ordinance is owned by plaintiffs, Samuel and Berta Reich and Rosa Singer. The site is commonly known as Reich Farm. This property has apparently been designated Rural Highway and Rural Residential in each of the township's master plans.

Portions of plaintiffs' properties have been placed on the national priorities list of hazardous waste sites (commonly known as the Superfund list) by the Environmental Protection Agency (EPA) pursuant to authority granted to the President under the Comprehensive Environmental Response, Compensa-

tion and Liability Act (CERCLA), 42 *U.S.C.A.* 9601 *et seq.,* which authority has been delegated to the EPA. Presently the EPA is considering Ciba's plan of reclamation which is designed to remove the toxic waste. Ciba has been seeking federal, state and local approvals for the construction of a pharmaceutical plant which would replace the present use of its property.

On June 28, 1988, defendant introduced an ordinance to amend and supplement chapter 101 of the Code of the Township of Dover, which regulates land use and development. On July 12, 1988, the township conducted a public hearing and adopted the ordinance on second reading. The effect of the ordinance is to redesignate the area in which plaintiffs' properties are located to a preservation-reclamation zone. The ordinance permits the continued operation of Ciba's present manufacturing facility but renders it nonconforming.

Ciba brought an order to show cause to declare the ordinance amendment invalid. The owners of the Reich property thereafter filed a complaint challenging the ordinance. On the return date of the order, the Ciba and Reich cases were consolidated. At the time of the initial application, the court identified three issues which were to be briefed:

1. whether the ordinance constitutes a valid exercise of the zoning power of the municipality;

2. whether the ordinance imposes an invalid moratorium;

3. whether the subject which the ordinance addresses has been preempted by state or federal law.

The threshold issue relates to the validity of the ordinance. The court having found that the ordinance is not within the zoning power of the municipality, the other two issues have become moot.

■■■ This ordinance tests the limits of the zoning power. Zoning is an exercise of the state police power. Municipalities have no power to zone except as it is delegated to them by the Legislature. *Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp.,* 80 *N.J.* 6, 20 (1976), *cert.* den. 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). The power to zone is contained within

*N.J.S.A.* 40:55D–62. Ordinances enacted pursuant to that power, like any other municipal ordinances, are entitled to a presumption of validity. That presumption can only be overcome by an affirmative showing that the ordinance is arbitrary, capricious or unreasonable. *Bow & Arrow Manor, Inc. v. West Orange,* 63 *N.J.* 335 (1973). While the power of a municipality to zone is broad, it must utilize its power within the limits of the legislative delegation and the standards which accompany that delegation. In particular, the ordinances must bear a real and substantial relationship to the regulation of land use within the municipality. *State v. Baker,* 81 *N.J.* 99, 105 (1979); *Taxpayers Assn. of Weymouth Tp., supra,* 80 *N.J.* at 21. The ordinance must advance one of the many purposes specified in the enabling statute. *N.J.S.A.* 40:55D–2. The promotion of the general welfare is one of those purposes. *N.J.S.A.* 40:55D–2(a). The township relies heavily upon that purpose as justification for its enactment.

Justice Pashman, in the *Weymouth* decision, commented that the term "general welfare" is "a capacious phrase which appears to encompass all the others." 80 *N.J.* at 21. Our courts have regularly noted that interpretation of the zoning power is amorphous and ever evolving. *So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel,* 67 *N.J.* 151 (1975), *cert.* den., 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975). The *Weymouth* decision well summarizes the approach:

> The concept of the general welfare in land use regulation has been given an expansive interpretation by both this Court and the United States Supreme Court.... In this regard, the term is mutable and reflects current social conditions. [80 *N.J.* at 21–22; footnote omitted]

Our courts have clearly enunciated the criteria by which the validity of zoning ordinances may be evaluated. They have been synthesized in *Riggs v. Long Beach Tp.,* 109 *N.J.* 601 (1988), as follows:

> Although the judicial role is circumscribed, a court may declare an ordinance invalid if in enacting the ordinance the municipality has not complied with the requirements of the statute. [citation omitted] Generally, a zoning ordinance must satisfy certain objective criteria. First, the ordinance must advance one

of the purposes of the Municipal Land Use Law as set forth in *N.J.S.A.* 40:55D–2. [citation omitted] Second, the ordinance must be 'substantially consistent with the land use plan element and the housing plan element of the master plan or designed to effectuate such plan elements,' *N.J.S.A.* 40:55D–62, unless the requirements of that statute are otherwise satisfied. Third, the ordinance must comport with constitutional constraints on the zoning power, including those pertaining to due process [citation omitted]; equal protection [citation omitted]; and the prohibition against confiscation. [citation omitted] Fourth, the ordinance must be adopted in accordance with statutory and municipal procedural requirements. [citation omitted; at 611–612]

As in *Riggs*, the court need only address the first criterion to decide this dispute. As noted at the outset of this opinion, the court finds that the ordinance does not satisfy any lawful zoning purpose. The *Riggs* decision provides guidance for a resolution of this issue:

> If an ordinance has both a valid and an invalid purpose, courts should not guess which purpose the governing body had in mind. [citation omitted] If, however, the ordinance has but one purpose and that purpose is unlawful, courts may declare the ordinance invalid.... This inquiry should be limited to an evaluation of the objective facts surrounding the adoption of the ordinance. [*Id.* at 613]

Ciba asserts that the ordinance was passed not for any purpose related to zoning but rather because the local authorities, under pressure from their constituents, concluded that the EPA and the New Jersey Department of Environmental Protection (DEP) were not doing their jobs. Ciba additionally alleges that the ordinance was used as a means of prodding these agencies and Ciba into taking remedial action before the local authorities were called upon to approve Ciba's application for its proposed pharmaceutical facility. Defendant responds that the purpose of the ordinance was to preserve the public health, safety and welfare, by preventing any site disturbance or alteration until ongoing investigations were completed and the site reclaimed. Additionally, defendant sought to prohibit any construction or construction-related activities which would have the potential of jeopardizing the cleanup. In support of its position defendant has filed affidavits of two members of the

governing body which deny Ciba's assertion of improper motive and support defendant's statement of purpose.

The court is required to search the record to obtain objective facts which would demonstrate the true purpose or purposes of the ordinance. In that regard, the court has examined the statement of purpose as contained within the ordinance itself and the transcript of the proceedings before both the planning board and the governing body as it relates to the adoption of the ordinance. Additionally, the court has reviewed a resolution of the governing body adopted pursuant to *N.J.S.A.* 40:55D–62, in which the governing body explains its reasons for deviating from the master plan.[1] Finally, the court has considered the two affidavits of the committee members referred to above.

Section 1 of the ordinance recites its purpose. Among other things, the ordinance finds that it is in the best interest of preserving public health, safety and welfare that the Ciba site not be disturbed or altered until site evaluation is finished and remediation is completed. Additionally, it concludes that any further development prior to completion of the cleanup "has the potential to jeopardize the validity of the site evaluation data and the efficacy of the implementation and execution of the cleanup plan for the site." It concludes that to "preserve this site for future reclamation," the only permitted activities on the site (other than the pre-existing use) shall be activities directly

---

[1] It should be noted that the court advised all counsel involved in this case that the governing body had failed to comply with the provisions of *N.J.S.A.* 40:55D–62 prior to the adoption of the ordinance. Under normal circumstances this court would have dismissed the pending action or at least remanded it in order to permit compliance with the statute. However, all parties stipulated that such a procedure would merely delay the resolution of a critically important issue. Therefore, the court permitted defendant to adopt the resolution while this action was pending and all parties agreed to treat the adoption of the resolution as though it had occurred prior to the adoption of the ordinance.

related to site evaluation and cleanup.[2]

The statement of purpose thus relies upon the all encompassing concept of general welfare to support the abolition of all gainful uses except that which is already there and cannot be legally eliminated. It does not go beyond this very broad justification to define more clearly the relationship which the regulations bear to legitimate land use control.

The resolution adopted pursuant to *N.J.S.A.* 40:55D–62 embodying the township committee's reasons for adopting an ordinance inconsistent with the master plan does little to clarify the zoning purpose. After first denying that the ordinance is inconsistent (a curious assertion), it next claims that its master plan neither reflects the Superfund status of the properties involved nor the potential for environmental damage if "they are not rezoned to provide the proper opportunity for an environmental cleanup." Thereafter, it substantially tracks the statement of purpose of the ordinance in finding that the general welfare requires the limitation of uses contained in the ordinance. It states that the overall purpose of the master plan, which it again defines as the protection of the public health, safety and promotion of the general welfare, "is of greater importance in determining the zoning of a parcel than any specific designation of preferred zoning for a site." Finally, the resolution acknowledges the obligation of the zoners to provide sufficient space in appropriate locations for a variety of uses and concludes, without explanation, that the ordinance achieves that goal. The resolution accomplishes nothing more than the ordinance in terms of a clear statement of legitimate zoning purpose. It merely cants the general welfare without relating that spacious term to more definitive zoning purposes.

---

[2]It is interesting to note that while the ordinance establishes regulations for the Ciba and Reich properties, the statement-of-purpose section appears limited to the Ciba site.

The transcripts of the hearings before the planning board and governing body are most reflective of the true legislative purpose. The following excerpts are demonstrative:

Dover Township Planning Board—June 20, 1988:

A BOARD MEMBER (also member of the governing body):

... I support the proposed ordinance ... due to the fact that it is imperative that the site is cleaned up immediately.

The DEP and the EPA have [to] come up not only with a plan, but also a time table of when that site will be cleaned up before any consideration is given at all by the Planning Board for any type of permit. Part of that should also include a land-based alternative instead of using the Ciba–Geigy pipeline as part of that site plan approval. [TR. 4–5]

THE CHAIRMAN: ... I am very curious and anxious to see the determination from the New Jersey DEP and the EPA regarding this particular site. I think pending that information, I would have to go along with the request.... [TR. 5]

THE MAYOR: ... [T]he fact also remains that to define the tract of land as to what is the superfund site and what isn't, who the hell cares? The fact is it's a superfund site and if we're going to go out there and try to make a determination as to whether the DEP says two acres or the DEP says six acres, it doesn't really matter. The fact is we have a problem and we have to address that problem. It's damn sight time that we recognize the fact that the EPA has not moved sufficiently in the past enough to rectify this and the DEP has not moved fast enough.

We have a bill pending on the closing of the pipeline which is going to be delayed because somebody from Washington, D.C. has decided to come to Toms River and offer information on possible cleanup methods. Do they meet the requirements of the community? Do they meet the requirements of the site itself? In fact, when can we expect the time table for any of these possibilities quote unquote to be put into effect? [TR. 7–8]

Dover Township Planning Board—July 11, 1988:

THE MAYOR: ... I think we have been handed a smoke screen from the Federal Government. I think what this is doing is nothing more than saying look, we're making an honest attempt. Well, I think that's falling short of what the Township deserves and what the Township is entitled to.

. . . .

... I would hope that this agency, along with the Dover Township Committee, could finally stand up to the fact that if you do take the initiative and are willing to stand strong to face the fact that it needs to be cleaned up and that it needs to be progressed, we can also then reassess our actions tonight and *go back into the Industrial Zone later on,* but only once we are convinced that the contamination is cleaned up.... [TR. 19–20; emphasis added]

A BOARD MEMBER (also member of the governing body): ... So, my opinion is this is the only course of action that we can take as a responsive

governing body to change the zoning of Ciba–Geigy so, therefore, we have local control. [TR. 22]

THE CHAIRMAN: ... Speaking personally for myself, until the EPA and the DEP can give a favorable clearance for this particular project, I would have to ... [support] this proposed ordinance to have this a Preservation Reclamation Zone.

Dover Township Committee—July 12, 1988:

THE MAYOR: ... It would be the most logical thing to me that the Ciba–Geigy Corporation proceed immediately to take the Environmental Protection Agency into court and demand them the right to begin to cleanup the site.

And you know, if we do rezone this—and I don't know how this will go before it's over—but if we do rezone this, after it's cleaned up in record time and we do have the program in line, it can always be reconsidered and reopened at that time. [TR. 17]

ANOTHER COMMITTEE MEMBER: ... [T]his ordinance ... was more than—to me, anyway—it was more than just wanting to push—finding a way to push the EPA to clean up the site. To me, the thing that I can't accept is the use of the pipeline for discharging for either the current use....

. . . .

So, my only alternative is to change the zoning out there so there can't be any construction during the cleanup and there can't be any future construction that doesn't conform with a reclamation zone. [TR. 50–52]

The affidavits of two committee members speak to reasons why the ordinance was adopted. Both affidavits first deny that the ordinance was "passed to force the Environmental Protection Agency or the Department of Environmental Protection to clean up the site...." The affiants contend both that the purpose was to protect the public health, safety and welfare "by keeping the Superfund sites from being disturbed until the cleanup" has been completed and that construction work on the site has the potential to jeopardize the cleanup.

This review of the record vividly portrays the setting in which the ordinance was passed and the underlying purposes. The frustration level had peaked. The public demand for action was intense. Ciba was moving forward with its planned pharmaceutical facility despite the failure to identify the nature and extent of the hazard or to develop a plan for remediation. Something had to be done to expedite the cleanup and put pressure on those who had control of that process. Stripped to its essen-

tials, the purpose of the ordinance was to achieve that end. It may be conceded that the goal was appropriate and, in that sense, the general welfare would be served. However, the mere invocation of the term "general welfare" is insufficient to sustain an act not truly grounded in the authority delegated to the municipality to regulate land use. The purpose is completely unrelated to any of the enumerated zoning powers contained in *N.J.S.A.* 40:55D–62. The ordinance does not bear a real and substantial relationship to land use regulation. Thus, the township chose an impermissible means to accomplish its objective when it grounded its action in the zoning power.

Even if the ordinance under attack were within the zoning power of the township, it still would have to be invalidated. That is so because it prohibits any productive use other than the existing nonconforming use. The law will not tolerate that limitation.

We start with some fundamental tenets. Municipalities, being created by the State, have no powers except those delegated to them by the State Constitution and the Legislature. *Dome Realty, Inc. v. Paterson,* 83 *N.J.* 212, 225 (1980). Through zoning, the State exercises its power to protect the public health, safety and morals and to promote the general welfare. *Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., supra,* 80 *N.J.* at 20. Municipalities inherit the power to zone through the State's delegation of its police power. *N.J. Const.* (1947), Art. IV, § VI, par. 2. The delegation is currently contained in the Municipal Land Use Law. *N.J.S.A.* 40:55D–1 *et seq.*

Generally speaking, zoning is a method whereby a community is divided, pursuant to a comprehensive plan, into districts, with certain uses permitted in each of those districts. The Supreme Court has defined the process:

> ... The essence of zoning is territorial division in keeping with the character of the lands and structures and their peculiar suitability for particular uses, and uniformity of use within the division. The genius of the constitutional and statutory zoning process is the regulation of land and buildings by districts according to the nature and extent of their use; and it goes without saying that

arbitrary deviation from the general rule is forbidden, on constitutional principle as well as the policy of the statute. [*Katobimar Realty Co. v. Webster*, 20 *N.J.* 114, 123 (1955)]

Thus, the Municipal Land Use Law speaks in terms of regulation of use in its delegation of zoning authority. *N.J.S.A.* 40:55D–62(a) authorizes the governing body to adopt zoning ordinances "relating to the nature and extent of the uses of land and of buildings and structures thereon." *N.J.S.A.* 40:55D–65 addresses the legitimate contents of a zoning ordinance and emphasizes the primacy of the control of uses in zoning regulations. For example, *N.J.S.A.* 40:55D–65(a) provides that a zoning ordinance may:

> [l]imit and restrict buildings and structures to specified districts and regulate buildings and structures according to their type and the nature and extent of their use, and regulate the nature and extent of the use of land for trade, industry, residence, open space or other purposes.

As noted above, as our zoning law has evolved the courts have read the zoning statutes liberally in response to changing social needs. Therefore, in addition to *physical use*, the courts have sometimes sustained restrictions relating to the *users* of property, provided that the limitations do not bear too remote a relationship to land use. See *Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., supra* and the cases collected therein, 80 *N.J.* at page 33. The *Weymouth* court framed the issue:

> ... The point at which the relationship between the principal purpose of a zoning ordinance and the regulation of land use becomes so tenuous as to place the ordinance beyond the limits of the zoning power cannot readily be determined in the abstract; it must be determined within the factual context of each case. [80 *N.J.* at 33–34]

The challenged ordinance does not, on its face, prohibit all uses of the land in the Preservation–Reclamation Zone. The ordinance permits site evaluation and cleanup activities performed by, at the request of, or under the direction of, the EPA or DEP. But is evaluation or reclamation a use? That issue was discussed in *Morris County Land Improvement Co. v. Parsippany–Troy Hills Tp.*, 40 *N.J.* 539 (1963). In that case the ordinance severely restricted the use of swampland and also strictly regulated reclamation or improvement of the land. The

Court recognized that the prime object of the ordinance was the retention of the land substantially in its natural state, essentially for public purposes. The Court found that the ordinance constituted a taking without just compensation and was therefore unconstitutional. In so holding the Court noted that the so-called permitted uses amounted, for the most part, to strict regulation of land reclamation in aid of uses allowed as of right. *Id.* at 546. It went on to say:

> ... Filling land otherwise not usable is obviously not in and of itself an 'existing use' of it in the statutory sense; here it amounted, at most, only to preparation for some indefinite and conjectural future use....
>
> ....
>
> There cannot be the slightest doubt from the evidence that the prime object of the zone regulations is to retain the land substantially in its natural state....
> ... All in all, about the only practical use which can be made of property in the zone is a hunting or fishing preserve or a wildlife sanctuary, none of which can be considered productive. [at 550–552]

The impact of the ordinance before the court is similar to the effect of the restrictions involved in *Morris County Land.* The result is to deny any productive use except for the existing nonconforming use. The purpose is to freeze further development with the hope that plaintiffs (particularly Ciba) and the appropriate environmental agencies will be forced into expediting the cleanup. The intent of the ordinance is to exact a *quid pro quo* to any productive use. The cleanup is a precondition to future development. In the interim, however, the "right" to reclaim is no more a right to make a productive use than it was in the *Morris County Land* case.

Defendants attempt to avoid this conclusion by pointing to Ciba's right to continue the nonconforming use. For the purposes of this decision, the court can ignore the fact that at the time the ordinance was adopted, the township knew of Ciba's intent to abandon its present use. The ordinance, in conceding Ciba's right to continue its business, does nothing more than recognize that the use is protected under state law. *N.J.S.A.* 40:55D–68. The township attempts to use the statutory restriction of its authority to eliminate nonconforming uses as a

means of empowering it to prohibit all other uses. The property owner's shield has become the regulator's sword.

One of the principle purposes of zoning is to cause orderly development by confining specific uses to defined areas. *Hay v. Fort Lee Bd. of Adjustment,* 37 *N.J.Super.* 461, 464 (App. Div.1955). Nonconforming uses are inconsistent with that goal and they are permitted to exist only because they were established prior to the date of adoption of the ordinance rendering them nonconforming. The policy permitting the continuance of nonconforming uses reflects both practical necessities and constitutional concerns of unlawful taking. *Grundlehner v. Dangler,* 29 *N.J.* 256, 262–63 (1959). However, the thrust of the law is to restrict these uses closely and to reduce them to conformity as quickly as is compatible with justice. *Monmouth Lumber Co. v. Ocean Tp.,* 9 *N.J.* 64 (1952); *Belleville v. Parrillo's, Inc.,* 83 *N.J.* 309, 314 (1980). *N.J.S.A.* 40:55D–68 reflects that intent. It limits reconstruction of nonconforming uses to instances of partial destruction. Complete destruction normally precludes rebuilding. *Krul v. Bayonne Bd. of Adjustment,* 122 *N.J.Super.* 18 (Law Div.1972), aff'd, 126 *N.J.Super.* 150 (App.Div.1973); *Lacey Tp. v. Mahr,* 119 *N.J.Super.* 135 (App.Div.1972).

The township, in order to avoid zoning the property into inutility, must instead promote the continuance of a nonconforming use. No provision is made in the ordinance for any other productive use of the property if that use is destroyed. Our law will not tolerate such a circumstance without providing for just compensation. *Harrington Glen, Inc. v. Leonia Board of Adjustment,* 52 *N.J.* 22 (1968). Given the township's public position concerning the detrimental effects of the present use of Ciba's property and the doctrine discouraging reconstruction of nonconforming uses, it is difficult to conceive of permission being granted for the rebuilding of the present facility should it be destroyed. In short, the ordinance must provide for a permitted use which is productive. Merely allow-

ing the continuance of the nonconforming use, as the statute mandates in any event, is simply not enough.

The court invalidates the ordinance before it only because the law compels that conclusion. The fear and frustration which resulted in the adoption of the ordinance is understandable. The township residents have known for years of the pollution at the site, but at the same time they have been left in the dark as to the extent of the peril. The township has tried to participate in expediting the cleanup. It has also exhibited commendable patience while the administrative wheels grind ever so slowly towards even a full understanding of the scope of the problem.

The fears have been heightened further during the pendency of this litigation by the release of the opinion of the Department of Environmental Protection, Division of Coastal Resources, which responds to Ciba's application for a permit to construct a pharmaceutical plant to replace the existing facility. The findings of the Director of the Division, while subject to appeal, are indeed frightening. They include the following:

> The Remedial Investigation/Feasibility Study ('RI/FS') conducted by EPA has documented the presence of extensive soil and groundwater contamination on-site, and identified surface water contamination (of the Toms River), off-site migration of the ground water contamination, and adverse air quality impacts. Actions taken by EPA to date under the Superfund process have not yet, however, fully identified or assessed the scope and extent of contamination at the site.
>
> Indeed, 13 areas at the site have currently been identified as potential sources of contaminants.... Two of these areas ... will not be addressed at all by the Superfund process due to the applicability of other federal laws ...; eight areas will require further investigation before remedial action alternatives can even be considered, and only three areas ... have been sufficiently characterized to proceed to the feasibility study phase.
>
> In the near future, the EPA is scheduled to complete a Record of Decision (ROD) selecting a method of halting the migration of groundwater contamination off-site and of treating the on-site groundwater contamination.... *Full characterization of the scope and extent of on-site and off-site contamination, as well as actual remediation of the contamination, is, at best, years away.* [Department of Environmental Protection Opinion # 105, October 22, 1988 at 5–6; emphasis added]

Based on these findings and more, the Division found itself compelled to deny the permit. Regrettably, based on existing

zoning law, this court also finds itself compelled to invalidate the ordinance before it. The sad truth is that even if this ordinance could be sustained, it would not require a cleanup of the site. Ciba could sit on its nonconforming use, or at best, the ordinance might be a slight incentive to those who truly have the power to bring about the cleanup, to get it done more quickly. However, any real hope for remedy lies in the hands of those entrusted by law to remediate hazardous sites. Their failure to act is at the heart of this litigation. The result in this case could not significantly alleviate that failure. Instead, the pressing public need, the right of our citizens to know and to be protected, should impel their response. Regrettably, the township's effort to get action may not be grounded in the zoning power. We can only hope that this well meaning act, though found unlawful, has caught the attention of those responsible to abate this degradation of our environment. As the township committee asked—how long must we wait?