Plaintiff's attorney should submit an order consistent with the above.

570 A.2d 1032

LAKEWOOD RESIDENTS ASSOCIATION, MANNY AND ANN BERKOWITZ, CHARLES AND SHIRLEY SCHOENFIELD AND STANFORD AND LESLEY KANE, PLAINTIFFS, v. CONGREGATION ZICHRON SCHNEUR, LAKEWOOD TOWNSHIP PLANNING BOARD AND LAKEWOOD TOWNSHIP, DEFENDANTS.

Superior Court of New Jersey
Law Division Ocean County

Decided February 27, 1989.

*Charles E. Starkey* for plaintiffs (*Starkey, Kelly, Blaney & White,* attorneys; *Mark A. Troncone* on the brief).

*Steven I. Pfeffer* for defendant Congregation Zichron Schneur (*Levin, Shea & Pfeffer,* attorneys; *Madeline Brady Russell* on the brief).

*Bernard E. Ressner* for defendant Lakewood Township Planning Board.

*Dominick M. Manco* for defendant Lakewood Township.

SERPENTELLI, A.J.S.C.

In this action in lieu of prerogative writs, plaintiffs seek to invalidate a site plan approval granted by defendant planning board to defendant congregation.

Congregation Zichron Schneur obtained site plan approval from the planning board to construct a two-story Orthodox Jewish synagogue in the Oak Knoll section of Lakewood Township. The property is in an R–12 zone. A house of worship is a permitted use. The site plan met all the bulk requirements so that no variances were needed. The congregation asserts a need to build its house of worship in proximity to its members' homes because Orthodox religious law prohibits operation of a motor vehicle on the Sabbath, from sundown Friday to sundown Saturday.

Plaintiffs contend that the Lakewood zoning ordinance, as it relates to houses of worship, is arbitrary, capricious and unreasonable in its treatment of the lot area, buffer and parking requirements. They cite three reasons for invalidity, namely, a disparate treatment of houses of worship in various zones in the township, inadequate bulk standards and inadequate parking requirements.

We start with some fundamental principles. The power to zone is contained within *N.J.S.A.* 40:55D–62. Ordinances enacted pursuant to that power, like any other municipal ordinances, are entitled to a presumption of validity. That presumption can only be overcome by an affirmative showing that the ordinance is arbitrary, capricious or unreasonable. *Bow*

*and Arrow Manor, Inc. v. West Orange*, 63 *N.J.* 335, 307 *A.*2d 563 (1973). While the power of a municipality to zone is broad, it must utilize its power within the limits of the legislative delegation and the standards which accompany that delegation. In particular, the ordinance must bear a real and substantial relationship to the regulation of land use within the municipality. *State v. Baker*, 81 *N.J.* 99, 105, 405 *A.*2d 368 (1979); *Taxpayers Assn. of Weymouth Tp., Inc. v. Weymouth Tp.*, 80 *N.J.* 6, 21, 364 *A.*2d 1016 (1976), *cert.* den. 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977); *Ciba–Geigy Corp. v. Dover Tp.*, 230 *N.J.Super.* 317, 320–21, 553 *A.*2d 398 (Law Div.1988). The ordinance must advance at least one of the many purposes specified in the enabling statute. *N.J.S.A.* 40:55D–2. However, consistent with the presumption of validity, courts will impute a proper governmental purpose or interest as the object to be served by the ordinance. If necessary, courts will infer an adequate basis to support the legislation, even if the purposes or findings are not expressed by the lawmakers. *Bell v. Stafford Tp.*, 110 *N.J.* 384, 394, 541 *A.*2d 692 (1988); *Hutton Park Gardens v. West Orange Town Council*, 68 *N.J.* 543, 564–565, 350 *A.*2d 1 (1975); *Burton v. Sills*, 53 *N.J.* 86, 95, 248 *A.*2d 521 (1968), app. dism. 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.*2d 748 (1969).

In *Kozesnik v. Montgomery Tp.*, 24 *N.J.* 154, 131 *A.*2d 1 (1957), the Supreme Court defined a judge's role in assessing challenges to the validity of zoning ordinances. The Court noted that the zoning statute delegates legislative power to local government and that the judiciary cannot exercise that power either directly or indirectly by measuring the policy determination through a judge's private view of the situation. As the Court put it:

> The wisdom of legislative action is reviewable only at the polls. The judicial role is tightly circumscribed. We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable. [at 167, 131 *A.*2d 1; citations omitted]

*Kozesnik* emphasizes that if a zoning amendment presents a "fairly debatable issue" the court may not interfere with the legislative judgment that the purposes of the zoning act are being served. In every case, the question is one of reasonableness under the circumstances. *Id.* at 168–169, 131 *A.*2d 1.

Additionally, *Kozesnik* noted that dissimilar treatment does not necessarily bespeak capriciousness. The Court said that if all properties similarly situated had to be accorded identical treatment, the objective of a well balanced community could be undermined. The final test must be whether the municipality is seeking to advance a community interest as opposed to a private or sectional advantage. *Id.* at 172, 131 *A.*2d 1.

As with other zoning issues, the question of what constitutes a community interest as opposed to a private or sectional advantage is protean. Our courts have acknowledged that interpretation of the zoning power is amorphous and ever evolving. The Supreme Court, in *Taxpayers Assn. of Weymouth Tp., Inc. v. Weymouth Tp., supra,* summarized the approach:

> The concept of the general welfare in land use regulation has been given an expansive interpretation by both this Court and the United States Supreme Court. [citation omitted] In this regard, the term is mutable and reflects current social conditions. [80 *N.J.* at 21–22, 364 *A.*2d 1016; footnote omitted]

As our zoning law has evolved, the zoning statutes have been read liberally in response to changing social needs. Therefore, in addition to *physical use,* the courts have sometimes sustained restrictions relating to the *users* of property, provided that the limitations do not bear too remote a relationship to land use. See *Taxpayers Assn. of Weymouth Tp., Inc. v. Weymouth Tp., supra,* and the cases collected therein at 33, 364 *A.*2d 1016. As to religious uses, the courts of this state and other states as well as the United States Supreme Court have given very close scrutiny and sensitive attention to laws which would tend unduly to restrict or regulate such activities. Thus, Justice Clifford, in his concurring opinion in *State v. Cameron,* 100 *N.J.* 586, 498 *A.*2d 1217 (1985), said:

[T]he power to affect, through zoning, religious activity in a residential area surely has its limits. Like any other aspect of the police power, the zoning authority must be exercised for the general welfare of the community, [citation omitted] and 'must be exercised within constitutional limits' [citation omitted]. Moreover, courts have held that religious activity itself is in furtherance of public morals and the general welfare, [citation omitted] and that religious institutions enjoy a highly-favored and protected status, which severely curtails the permissible extent of governmental regulation in this area. [citation omitted]

... Deprivation of the protections afforded thereby requires the State to demonstrate some 'overriding governmental interest,' [citation omitted] that justifies the 'substantial infringement of appellant's First Amendment right' and to show that 'no alternative forms of regulation would combat such abuses without infringing First Amendment rights.' [at 606–607, 498 A.2d 1217; citation omitted]

In *Jehovah's Witnesses v. Woolwich Tp.*, 223 *N.J.Super.* 55, 537 *A.*2d 1336 (App.Div.1988), our Appellate Division adopted the approach suggested by Justice Clifford in the *Cameron* case:

[T]he court must make a thorough exploration and a careful evaluation of the facts bearing on the competing religious and governmental interests.

We will not attempt to catalog all of the factual considerations which may bear on the resolution of such a question. Some of the significant considerations, however, are as follows. The court must determine whether the activity allegedly burdened by the zoning ordinance is in fact religious. [citation omitted] It must determine whether the ordinance imposes a significant burden on religious practice. [citations omitted] Another significant consideration is what alternative locations are reasonably available to the religious organization and what zoning alternatives are available to reasonably accommodate the organization. [citations omitted] The court must also carefully identify and evaluate the governmental interest in establishing and maintaining its zoning plan.... However tested and articulated, the propriety of the zoning restriction must turn on a weighing of the conflicting religious and governmental interests thus identified. [100 *N.J.* at 60–61, 498 *A.*2d 1217]

*See also Farhi v. Deal Borough Commissioners*, 204 *N.J.Super.* 575, 499 *A.*2d 559 (Law Div.1985). As the United States Supreme Court succinctly stated in *Lynch v. Donnelly*, 465 *U.S.* 668, 104 *S.Ct.* 1355, 79 *L.Ed.*2d 604 (1984), the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." 465 *U.S.* at 673, 104 *S.Ct.* at 1359.

Finally, it should be noted that, in assessing community needs, the court must allow wide latitude to the expertise and judgment of a governing body, just as it does to a board of adjustment or planning board, because of the members' peculiar knowledge of local conditions. *Cf. Ward v. Scott*, 16 *N.J.* 16, 23, 105 *A.*2d 851 (1954). Our Supreme Court, in *Committee for a Rickel Alternative v. City of Linden*, 111 *N.J.* 192, 543 *A.*2d 943 (1988), in another context, put it this way:

> We conclude that the existence of that option evidences a legislative intent to grant to the governing body a substantive role in the variance process, *a role for which that body is well-suited in light of its own knowledge and expertise in the area of local zoning matters.* [111 *N.J.* at 203, 543 *A.*2d 943; emphasis supplied]

The broadness and importance of the local option was emphasized by Justice Brennan in his dissenting opinion in *Katobimar Realty Co. v. Webster*, 20 *N.J.* 114, 118 *A.*2d 824 (1955), as follows:

> New Jersey has witnessed a marked and salutary change in the judicial attitude toward municipal zoning over the past decade. Long overdue recognition of the legitimate aspirations of the community to further its proper social, economic and political progress, and of the propriety of requiring individual landowners to defer to the greater public good, have replaced the narrow concepts held by former courts. Present-day decisions rightly give maximum play to the philosophy underlying our constitutional and statutory zoning provisions that localities may decide for themselves what zoning best serves and furthers the local public welfare, subject only to the rule of reason forbidding arbitrary and capricious action. [at 129, 118 *A.*2d 824; citations omitted]

Having established the principles under which this court must review the ordinance, I turn to plaintiff's specific challenges. They fall into three categories: (1) disparate treatment between houses of worship located in a residential zone and those located in a highway development zone, (2) inadequate bulk regulation and, most heavily stressed, (3) inadequate parking requirements. The court will address those issues in that order but must first briefly describe the factual context in which they arise.

The congregation proposes to build an Orthodox Jewish synagogue in an R–12 zone. In that zone the permitted uses are single family detached homes, churches or any other place of

worship, including a parish house and a Sunday school building, elementary schools, high schools and other institutions of learning, public buildings of governmental or cultural nature and accessory uses. The minimum bulk requirements for churches and houses of worship are contained in section 18–12.2(b)(2) of the zoning ordinance. Among other things, the ordinance requires a minimum lot size of 15,000 square feet and a minimum lot frontage of 100 feet. The lot in question is approximately 107 feet in width, approximately 200 feet in depth and has an area of 21,496 square feet. Off-street parking is regulated by section 18–23 which requires one parking space for every six seats or one space for every 100 square feet of designated sanctuary floor area, whichever is more restrictive. No parking is permitted in the front yard or closer than ten feet to any side or rear property line. Section 18–23 also requires a landscape buffer of ten feet for both the rear and side property lines. It is conceded that the application conforms to all of the minimum requirements of the ordinance. It is also conceded that the regulations concerning the construction of houses of worship in the highway development zones (known as HD–6 and HD–7) differ from the R–12 zone. For example, the HD–6 zone permits the construction of a house of worship on a 10,000 square foot parcel and the HD–7 zone requires a minimum of one acre. Furthermore, the parking requirements in the HD zones are not computed on the basis of sanctuary area but only on seating capacity.

■ As to the claim that the ordinance treats the same uses in a disparate fashion, it has long been recognized that zoning regulations in particular districts must be uniform and reasonable and not be used to grant special privileges to one and deny them to others. *N.J.S.A.* 40:55D–62; *Beck v. East Orange Board of Adjustment*, 15 *N.J.Super.* 554, 83 *A.*2d 720 (App. Div.1951). Indeed, the statutory requirement for district-wide uniformity is a matter of constitutional imperative. *Urban Farms, Inc. v. Franklin Lakes*, 179 *N.J.Super.* 203, 215, 431 *A.*2d 163 (App.Div.1981). The Equal Protection Clause of the

Fourteenth Amendment forbids arbitrary discrimination between persons similarly circumstanced. However, a classification is consistent with these principles if it is reasonably based on the public policy to be served. It is one thing to say that all properties in like circumstances must be treated alike and use restraints must be general and uniform in a particular district. It is another thing to say that a municipality may not make classification distinctions based on real differences by taking into account the nature and extent of the use of the land and buildings within a district. The municipality has a right to make such distinctions. *Katobimar Realty Co. v. Webster*, *supra; Moriarty v. Pozner*, 21 *N.J.* 199, 121 *A*.2d 527 (1956).

■ Thus, it does plaintiff no good to argue that a highway development zone could abut a residential zone and that the regulations affecting each zone would be different. That is to be expected. Lines must be drawn somewhere. Plaintiff goes beyond that challenge by showing differences in the regulations for the two HD zones and compares the regulations in both of those zones to the R–12 zone. As to the first issue, the difference in bulk requirements for the HD zones, that problem is not before the court. The challenge here is to the validity of the requirements of the R–12 zone. As to the comparison of the HD regulations to the R–12 regulations, plaintiffs allege that the HD zones have no provision for parking to be computed based on the designated sanctuary area but only on seating capacity, whereas the R–12 zone provides an option for calculation based on either seating capacity or sanctuary size.

Plaintiffs' expert, Thomas A. Thomas, could find no justification for the distinction. He said that the use of sanctuary space to measure parking requirements was inappropriate and that the more widely used concept was the overall square footage of the building. Thomas also identified the differences in buffering and lot size requirements from zone to zone. While he conceded that it is not unusual to have different regulations for the same type of use in different zones, he

asserted that in this instance there was no justification for the inconsistency in the buffer requirements, the parking requirements and even the size of lots, since he views lot size as unrelated to the use.

Defendant congregation contended through its expert, Daniel McSweeney, that the differences in the restrictions for parking, buffer and lot requirements in the highway development zones, as compared to the R–12 zone, are attributable to several factors. First, he noted that the highway development zones are relatively new designations in the zoning pattern for Lakewood Township. Furthermore, he said that the regulations are attributable to the location of the highway development zones along the highway corridor, the necessity of providing for the privacy of those living in the surrounding areas and for the safety of those who would be members of the religious community in those areas. McSweeney argued that the highway development districts were created along Route 9 and Route 70 after 1978 and were established by the township to take advantage of the accessibility and availability of vacant land and to attract ratables in that developing area. By comparison, the zoning provisions for houses of worship in the residential zones were predicated on development patterns which existed at the time of the adoption of the zoning ordinance. He suggested that the drafters of the ordinance knew that the HD zones would be used primarily for those people who drive to houses of worship and that the residential zones would have both off-street and on-street parking as well as pedestrian access.

McSweeney said that good planning takes into account demographics. He asserted that houses of worship should be permitted uses in the residential zones, subject to reasonable standards, and that the governing body must evaluate available land area, size of lots and other factors. He contended that it is also reasonable to look at the likely users. Lakewood had to consider walking distance requirements for the Orthodox Jewish congregants in assessing the need for houses of worship within its residential zones. He concluded that measuring

parking based on sanctuary size is a reasonable approach when all of the factors involved in accommodating a religious use are considered—particularly the knowledge of the governing body that such houses of worship were likely to be used by a religious community whose members were precluded from driving to their house of worship for religious services on their sabbath.

It must be conceded that the comparison of the regulations in the R–12 and HD zones leaves some unanswered questions and demonstrates that the ordinance has room for improvement. However, McSweeney's justifications for the R–12 regulations have weight. The already established land use patterns, the limited amount of vacant land, the need of the users and the obligation to make reasonable accommodation for the free exercise of religion were all factors which had to be balanced in arriving at the residential zone requirements. Some of these requirements are not as relevant to the HD zone regulations.

Whether the best balance was attained is not the issue. Rather, the question is whether plaintiffs carried the weighty burden of establishing that the choices made are so disparate as to be arbitrary, capricious or unreasonable. The court concludes that plaintiffs have not carried that burden. There are real differences between the zones which justify the differing regulations.

■ Plaintiffs next attack the bulk requirements for houses of worship within the R–12 zone. Plaintiffs' expert, Thomas, asserted that the ordinance was unlawful because it provided area requirements for houses of worship which basically track the requirements for the other permitted uses in the zone. He alleged that a house of worship is a much more intense use of land than a single family residence and the introduction of such intensity into an established residential neighborhood without adequate lot size, buffering, floor area ratio standards or other suitable bulk requirements violates good planning. He conceded that, in the R–12 zone, a single family residence could be

built on a 12,000 square foot lot but a house of worship required a minimum of 15,000 square feet. However, he asserted that Lakewood is a developing community, that there is available vacant land and that he believes that there are parcels available in the R–12 zone of an acre or more which he considers a minimum size for a house of worship. He also claimed that the ten foot buffering requirement is inadequate because it cannot provide dense screening in a residential area.

In response the congregation's expert, McSweeney, disagreed with most of Thomas' assertions. First, he contended that Lakewood is a developed community, certainly with respect to the residential area involved in this zoning challenge. The evidence supports McSweeney's conclusion. He found that the buffer requirements were reasonable. He argued that the limited developable area within Lakewood's northeast quadrant required flexible bulk regulations and that the creation of a minimum standard of one acre would be unreasonable. Instead, he contended that the standard must bear a reasonable relationship to what he described as "who and what is there." Thus, he concluded that houses of worship should be permitted in residential zones subject to reasonable standards taking into account such factors as the available lot area, sizes of lots and their users. In effect, he argued for realistic zoning which would not preclude the opportunity to build houses of worship within residential zones. On cross examination plaintiffs' counsel pressed certain horror stories which McSweeney conceded, in part, were at least theoretically possible based on the present bulk requirements. McSweeney did argue that some of the scenarios would not be permitted because if the sanctuary space was reduced too greatly in comparison to the square footage of the building, it no longer would be the primary use. He had to acknowledge, however, that a three story structure would be permitted and that, at least theoretically, a building of over 16,000 square feet could be constructed on a 15,000 square foot lot in an R–12 zone.

Again, the test of validity of zoning requirements is their reasonableness and the relationship that they bear to the regulation of land use. The reasonableness should not be gauged by hypothetical abuses of zoning ordinances. There undoubtedly are few regulations which could not be construed to obtain an absurd result. However, the drafters are entitled to utilize their knowledge of existing zoning patterns and development in the community as well as the manner in which the existing zoning regulations have historically been implemented.

Using that test, the two experts still disagreed. However, it can be said again that plaintiffs' evidence, with regard to the bulk requirements, simply did not rise to the level of proof required by the case law. In essence, Thomas' testimony represents his judgment that the regulations are not adequate—that they could be much better. That finding does not provide a clear showing that these regulations were arbitrary, capricious or unreasonable beyond debate, particularly when considered in light of McSweeney's testimony concerning existing land use development patterns and the actual implementation of the zoning regulations.

Finally, the most hotly debated issue was the adequacy of the parking requirements. The congregation proposes a 9,660 square foot building which includes a 2,000 square foot sanctuary. The sanctuary will have 120 seats. Twenty parking spaces will be provided thus satisfying both parking criteria, one space for every six seats or one space for every 100 square feet of sanctuary area.

Thomas testified that, generally speaking, parking requirements are designed to accommodate the peak use of the structure—that is, the maximum number of people who might occupy the structure at any time. He said that the best way to design parking for a house of worship is to provide spaces sufficient to accommodate its maximum utilization. He stated that parking standards have been developed in many ways, including the size of the building and the size of the sanctuary. However, he asserted that if standards are to be related to the

size of the sanctuary, there must be discretion left in the planning board to meet the potential for greater needs. He argued that the effect of the ordinance is to give the applicant authority to control the required parking by its discretionary designation of the size of the sanctuary area. He concluded that this does not satisfy any recognized planning criteria. He did agree that parking should not be a problem during times of religious services, but during other times, use of the social hall could create difficulties. He also contended that it would not be appropriate for the governing body to zone based upon its knowledge that no one other than an Orthodox Jewish congregation wanted to build in the R–12 zone. He reasoned that the municipality could establish a conditional use standard to accommodate those special needs.

McSweeney testified that the parking requirements were reasonable and that, in fact, the parking shown on the site plan may never fully be used. He believed that the relationship between the size of the sanctuary and the parking was reasonable since sanctuary size was likely to dictate the amount of parking. He also asserted that the governing body had a right to take into account the likely occupancy of the building by an Orthodox population which would not require intensive parking. He disagreed with Thomas concerning the criteria utilized in designing parking. He denied that parking requirements should be calculated to accommodate peak periods in the year. Rather, he employs normal peak usage on a daily basis. He conceded on cross examination that he was not aware of another denomination for which the parking on this site would be adequate. He acknowledged that the sanctuary standard only has real validity when applied to an Orthodox Jewish synagogue. He agreed that the parking would be inadequate if the size of the congregation doubled, but he also asserted that, under those circumstances, the congregation would have to seek the approval of the township to enlarge the sanctuary.

The adequacy of the parking regulations is certainly the most difficult issue in this case. However, the court must keep in

view the dictates of the decisional law which prohibit the court from substituting its judgment for that of the drafters of the ordinance. The question is not whether the court believes there should be more parking, but rather whether the governing body could have reasonably reached the conclusion that the standard provided for parking would result in sufficient protection of the welfare of its residents. The requirement for off-street parking for houses of worship does not preclude consideration of other factors such as available on-street parking, the number of people who might occupy each vehicle or the number of people who might choose to walk to the house of worship.

The governing body, in balancing the interests involved, could also decide that residents of the zone would have to tolerate occasional inconvenience caused by overflow on-street parking in order to give practical meaning to the freedom to worship. The testimony established that Lakewood has many houses of worship of all denominations and that many of them do not have adequate parking on-site. During peak usage there is off-site parking as well as people walking to services. The governing body was certainly aware that there was a substantial Orthodox Jewish population within the affected zone.

The question is whether the governing body has acted so unreasonably in providing such inadequate parking as to subject the ordinance to a finding that it is arbitrary, capricious or unreasonable or, put conversely, whether that issue is open to debate. I conclude that the testimony, when viewed in light of the broad discretion vested in the governing body, is insufficient to establish that the method of calculating parking as provided for in the ordinance is so clearly deficient or offensive to the public welfare as to be found arbitrary, capricious or unreasonable.

As the court noted in the *Jehovah's Witnesses* case, *supra,* the evaluation of ordinance provisions relating to religious practice involves many considerations. Among the significant factors are the availability of alternative locations, what zoning

options are available to accommodate the organization, identification and evaluation of the governmental interest in establishing and maintaining the zone plan and a weighing of any possible conflicting religious and governmental interests thus identified. The Lakewood governing body had to evaluate all of these factors in its desire to respond to the religious needs of the growing Orthodox Jewish population. It was probably impossible for it to do so given the developed nature of the township without offending some residents. The law cannot expect the impossible. *Cf. State v. Smith,* 46 *N.J.* 510, 518, 218 *A.*2d 147 (1966), *cert.* den. 385 *U.S.* 838, 87 *S.Ct.* 85, 17 *L.Ed.*2d 71 (1966). As the Supreme Court said in *Zorach v. Clauson,* 343 *U.S.* 306, 72 *S.Ct.* 679, 96 *L.Ed.* 954 (1952): "We are a religious people whose institutions presuppose a Supreme Being." *Id.* at 313, 72 *S.Ct.* at 684. Our branches of government have a right, indeed an obligation, to recognize the freedom of all to worship and to do that which is reasonable to respect this essential freedom. *Lynch v. Donnelly, supra.* The court should hesitate to set aside any effort to fulfill that obligation absent a clear showing that the regulations are arbitrary, capricious or unreasonable. The evidence does not meet that test. Therefore, the court sustains the ordinance.

570 A.2d 1040
LESSIE HILL AND CAROLYN HILL, PLAINTIFFS, v.
AMERICAN AIRLINES, INC., DEFENDANT.

Superior Court of New Jersey
Law Division Essex County
Special Civil Part

Decided September 27, 1989.